[Crim. No. 21977. Apr. 11, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
STANLEY WILLIAMS, Defendant and Appellant.

[Crim. No. 23806. Apr. 11, 1988.]

In re STANLEY WILLIAMS on Habeas Corpus.

1128

1132

## COUNSEL

Bert H. Deixler, under appointment by the Supreme Court, and Leslie A. Swain for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, William R. Weisman, Herbert Wilkinson, Susanne C. Wylie, Christine C. Franklin, Michael Nash, Robert R. Anderson and Joan Comparet, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

LUCAS, C. J.—Defendant was convicted of the murders of Alvin Owens, Thsai-Shai Yang, Yen-I Yang, and Yee Chen Lin, with special circumstances as to each count of felony murder (robbery) and multiple murder. The jury also convicted him of robbing each of these victims, and found he personally used a firearm during the commission of each crime. It then

returned a verdict of death. This appeal under the 1978 death penalty law is automatic. A petition for a writ of habeas corpus was filed in conjunction with the appeal, and we issued an order to show cause thereon and appointed a referee. For purposes of consideration and disposition, we have consolidated the two matters herein. After careful review of defendant's arguments, we affirm the judgment, and deny the petition for a writ of habeas corpus.

## 1. FACTS AND PROCEDURE

### A. *The "7-Eleven" Murder*

Alvin Owens was an employee at a 7-Eleven store in Whittier. Alfred Coward, known as "Blackie," testified as an immunized witness and gave the following account of Owens's death:

Approximately 10:30 p.m. on February 27, 1979, defendant came to Coward's house. The two went to the home of James Garrett (where defendant was staying) and defendant went inside, returning with a sawed-off shotgun. He was accompanied by a man named Darryl, who was wearing a brown corduroy jacket. The three men made several stops, including one to obtain "Sherms" (cigarettes containing phencyclidene (PCP)). They all shared a Sherm cigarette, and then picked up Tony Simms, who was dressed in a green jogging suit and a cap. Defendant shared a second Sherm with Coward and Simms, and asked Simms if he knew where he could "make money" in Pomona.

Taking two cars, the foursome made two unsuccessful restaurant and liquor store robbery attempts,[1] and eventually went to a 7-Eleven store where Owens, the victim, was sweeping the parking lot. Simms and Darryl went into the store followed by Owens, defendant and Coward. Coward testified he saw no one with a weapon except defendant, who approached Owens and told him to keep walking. Owens walked toward the back rooms of the store with defendant and Coward following him. Defendant told Owens to lie down and Owens complied. Coward heard a gun being loaded, heard a shot and glass breaking,[2] followed by two more shots. The group then returned to Simms's house where the money was divided.[3] Simms asked why defendant had shot Owens and defendant explained he did not

---

[1] Witnesses testified that around 4 a.m. on February 28, they saw four Blacks in a station wagon drive to a liquor store near the 7-Eleven. Two of the men got out and went into the store. One was wearing a green jogging suit and a beanie, the other wore a brown coat.

[2] A television monitor in the store had been shot out.

[3] The owner of the 7-Eleven store testified $120 was missing from the cash register.

want to leave any witnesses. He also said the shotgun shells could not be traced and that he had retrieved a few of them.

Coward saw defendant later that morning at the home of defendant's brother. He stated defendant told his brother, "You should have heard the way he sounded when I shot him." Defendant then made a growling noise and laughed hysterically for a number of minutes.

B. *The Brookhaven Motel Murders*

Robert Yang and his family owned and lived in the Brookhaven Motel on South Vermont Street in Los Angeles. About 5 a.m. on March 11, 1979, he heard a woman's screams and three or four shots. A few minutes later he left his bedroom and saw that the door separating the motel office from the living quarters was open. It appeared the door had been forced open from the outside. He discovered his father, mother and sister had all been fatally wounded by shotgun fire. The cash drawer was open and empty.

The police found two shotgun shell casings at the scene. A firearms expert testified that one of the shells could have been fired only from a weapon identified as having been purchased by defendant in 1974.

Three witnesses provided testimony regarding defendant's involvement in the Brookhaven incident. Samuel Coleman, testifying as an immunized witness, said that on March 10 he and defendant went to the Showcase Bar where he remained until it closed around 6 a.m. He last remembered seeing defendant about 2:30 a.m., but the next day defendant told him that he had robbed and killed some people on Vermont Street. Defendant said he got approximately $50 and was going to use it to buy PCP.

James Garrett testified that defendant kept some of his possessions at the Garrett house and stayed there approximately five days a week. Early on the morning of March 13, 1979, defendant told Garrett and his wife that he had heard that some Chinese people had been killed on Vermont Street. He said he did not know how the killings had occurred but thought the killers were professionals because no shells or witnesses had been left. He went on to say that he heard the killings had occurred at 5 o'clock in the morning, that two men had knocked down the door, and that the men had taken $600.

Later, defendant again spoke about how the people were killed. "[A]fter the big guy knocked the door down, he went in the motel, and there was a guy laying on the couch, and he blew him away." Defendant said the man on the couch and a woman at the cash register were shot twice, and another

woman was also shot. Garrett testified defendant told him he was the "big guy."[4]

Esther Garrett testified to essentially the same matters as her husband James. In addition to the admissions testified to by Mr. Garrett, Esther Garrett said defendant told them the killers were using the money to buy "juice" (PCP) and that the killers had picked up the bullets so there would be no evidence for the police. After her husband left, defendant told Mrs. Garrett he had committed the murder with his brother-in-law.

George Oglesby, also known as "Gunner," provided additional testimony. Oglesby was an inmate who was housed in the same cell block as defendant, a few cells away.[5] Oglesby testified that in late April defendant asked him about the chances of escaping from Atascadero or Patton, where he believed he might be sent. He later asked Oglesby if he wished to be included in an escape plan and Oglesby indicated he did. Defendant outlined a plan complete with drawings that involved escaping while being transferred from jail to court. According to the plan, as summarized by Oglesby, two people from "the outside" would disarm the officer driving the bus. Defendant also planned to kill a person on the bus who was to testify against him, as well as the two officers who would accompany the bus. Defendant later modified the plan to include blowing up the bus in order to prevent the authorities from quickly determining who had escaped.

Oglesby received two notes from defendant, one stating that a female visitor was not the girlfriend who was to be involved in the escape and the second stating that a female visitor had a new shotgun for him. A few days

---

[4] Garrett testified that he had the following conversation with defendant: "Well, we was riding, and we happened to be going down Western. He [defendant] asked me did I know about this certain motel called the Mustang Hotel. I said no. It was like that. He said, 'Well, Cus, I'm thinking about taking that off.' I said, 'How you going to take that off, Cus, because too many people off in there?' He says, 'No problem.' He said, 'I'll blow them away like I blew them away in the motel.' "

Defendant also told Garrett about the Owens murder. He said he had "blown away" a White man in a store; the man was on his hands and knees and he shot him in the head with a shotgun. He also told Garrett he was thinking about killing "Blackie" Coward because he was a "punk."

[5] At the time of his testimony, Oglesby had pleaded guilty to second degree murder, but had not been sentenced. He was originally charged with first degree murder, two counts of kidnapping, and one count of rape; special circumstances also were alleged. The special circumstance allegations were dropped at a Penal Code section 995 hearing. As a part of his plea, the remaining counts and a use allegation were to be dismissed.

A supplementary probation report prepared on Oglesby indicated the charge eventually would be reduced to manslaughter because he was to testify in other cases. Oglesby also testified that he understood his attorney had spoken to the district attorney who was prosecuting defendant's case about reducing the charges against him to second degree murder. He also hoped to receive protective housing in another state.

after receiving the notes Oglesby told Lt. Fitzgerald what he knew about the escape.

After talking to Lt. Fitzgerald, Oglesby again communicated with defendant about an escape. In one note defendant stated that someone on the outside had obtained dynamite for him. Another note asked whether they should delay their escape because his brother had been sentenced to three months for an earlier attempt to help him escape from jail. Oglesby testified he told defendant that it probably would be better to escape earlier rather than wait. In another note defendant asked whether they should escape at his next court appearance or try to go to the Los Angeles County Hospital and attempt an escape from there. Another note stated that "Blackie" was a heartbeat away from death and asked if Oglesby's wife had made arrangements to get weapons. In a subsequent note defendant suggested giving Oglesby's wife's phone number to his girlfriend, observed that his girlfriend had gotten a pump shotgun, and stressed his hope that Oglesby's wife had weapons. The note also directed Oglesby to phone his wife and make plans so she could arrange a meeting with a woman named "Lynn" to help with the escape.

The first target date for the escape was June 12, 1979. The plan was aborted, however, because defendant had no way of arranging to get Oglesby to court at the same time. In addition, Oglesby testified that after one of defendant's court appearances, defendant told him he had to cancel the escape attempt because he believed two police vehicles were following the bus. He then altered the plan so the attempt would occur after they left court.

In addition to relating the escape plans, Oglesby also testified defendant told him that he, Blackie, and two others had robbed a motel and had shot the people inside—a man, a woman and a child, possibly a daughter.

C. *The Defense*

Defendant presented an alibi defense. Beverly McGowan testified that on February 27, 1979, the night of Owens's murder, she and defendant dined and spent the night together.

Fred Holiwell, defendant's stepfather, testified that on Sunday morning, March 11, he arrived at the Showcase Bar around 3:30 a.m. He stated he thought he saw defendant there about 5 a.m. in the parking lot area. He remembered that he had seen his stepson there on this particular night because defendant had been involved in an altercation and had been cut across the chest.

Eugene Riley, an inmate in the same cell block as defendant, testified that on the morning of March 11, 1979, he saw defendant in the parking lot of the Showcase Bar about 5 a.m. and gave him a ride home around 5:30 a.m., and that defendant was smoking a Sherm.[6] Joseph McFarland, another inmate in defendant's cell block, testified he knew Oglesby was a "jailhouse rat" and that others knew this as well. McFarland stated inmates gave Oglesby false information because they knew he was an informant.

## II. Guilt Phase Issues

### A. Asserted Henry and Miranda Violations

Defendant claims Oglesby's testimony concerning the escape plan and defendant's admissions should have been excluded because Oglesby was a government informant who obtained information from him in violation of his Sixth Amendment right to counsel and his Fifth Amendment right against self-incrimination. Defense counsel objected to Oglesby's testimony solely on the ground that the testimony was more prejudicial than probative. (Evid. Code, § 352.)

Because counsel failed to object to Oglesby's testimony on constitutional grounds, the parties did not develop a complete record on the relationship between Oglesby and law enforcement officials, or the manner in which Oglesby obtained information from defendant. On the limited appellate record before us, we cannot determine whether Oglesby was a government agent, whether he deliberately elicited incriminating statements from defendant in violation of the Sixth Amendment, or whether he interrogated defendant in violation of the Fifth Amendment. Defendant's appellate contentions must therefore be rejected.

### 1. The Habeas Corpus Reference

As noted above, while this appeal was pending defendant filed the present petition for a writ of habeas corpus. The petition raised the Fifth and Sixth Amendment arguments asserted on appeal, and added the claim that trial counsel was ineffective by reason of his failure to object to Oglesby's testimony on constitutional grounds. We issued an order to show cause, and appointed retired Judge Paul Egly as our referee. We submitted five questions for determination:

(1) During what period of time, if any, was George Oglesby a "paid government informant" as that term is used in *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183]?

---

[6] Defense counsel attempted to establish through cross-examination that defendant was a frequent user of PCP and had been smoking it when the murders occurred.

(2) During what period of time, if any, was defendant aware that George Oglesby was a "paid government informant"?

(3) Upon what occasions, if any, did George Oglesby deliberately elicit incriminating statements from defendant in violation of rules established in *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], and *United States* v. *Henry, supra*?

(4) Upon what occasions, if any, did George Oglesby interrogate defendant in violation of the rules established in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]?

(5) Was defendant denied competent representation by counsel because counsel failed to object to the admissibility of George Oglesby's testimony on the ground that it violated the Fifth and Sixth Amendments to the United States Constitution and correlative provisions of the California Constitution?

From the testimony elicited at the hearing, it is clear that defendant told Oglesby about the Brookhaven Motel murders sometime prior to May 21-22, when Oglesby recounted that conversation to Lt. Fitzgerald. Fitzgerald testified Oglesby also told him at the May 21-22 meetings of Williams's boast of killing a large number of Orientals, but Oglesby said it was sometime later. At one point Oglesby said he received the "Blackie" note sometime early in May even though it bears the date of June 21; at another time he said it was after the May 21-22 meetings. It is apparent that the initial planning of the escape preceded May 21, including the delivery of the map and the two notes concerning Oglesby's wife. Sgt. Allender, who was assigned to prevent the escape, received the "dynamite" note from Oglesby on May 25, but it is not clear when Oglesby received it. Other notes, including all discussion of the role of Oglesby's wife, postdated May 25.

Oglesby and Fitzgerald testified concerning their meetings. Fitzgerald recalled a meeting on March 5 in which Oglesby asked Fitzgerald to review the record in Oglesby's murder case and see if he could help; the next meeting between the two was May 21. Oglesby recalled the first conversation as earlier than March 5, and claims there were several other meetings before May 21. But they both agree defendant was not discussed until the meetings of May 21 and May 22, that Fitzgerald never asked or directed Oglesby to get information from defendant, and never promised any reward for such information.

A few additional details appeared concerning the conversations between defendant and Oglesby. Most conversations took place on "freeway time,"

when prisoners were permitted to walk on the tier. Oglesby and defendant rarely discussed defendant's crime, but frequently discussed escape. Oglesby did not initiate these discussions or interrogate defendant, but neither was he a passive listener; drawing on his knowledge of police and courthouse routines (Oglesby had worked for a bail bondsman), Oglesby suggested a number of "improvements" in the escape plan.

Finally, the parties presented evidence concerning the competency of defense counsel. The evidence shows counsel was an experienced defense attorney and generally conducted a competent defense. He was, however, unaware of the decision in *United States* v. *Henry, supra* 447 U.S. 264, which was decided about eight months before defendant's trial. Counsel neither investigated the factual basis for a constitutional objection to Oglesby's testimony nor did he research the legal grounds for such an objection, but decided instead to concentrate on attacking Oglesby's credibility.

The referee submitted extensive findings, one of which, as we shall explain, disposes of defendant's Sixth Amendment claim. First, he found Oglesby was a "paid government informant" from only May 25, 1979, until the conclusion of defendant's trial. The referee further stated: "[Defendant] has failed to prove by a preponderance that there was a deliberate eliciting of the incriminating statements furnished the Sheriff by Oglesby on May 21, 1979 and May 22, 1979 in violation of rules established in *Massiah* v. *United States, supra* [377 U.S. 201] and *United States* v. *Henry, supra* [447 U.S. 264]. *The only evidence that the referee has at to the post May 22, 1979 date is that Oglesby was permitted to remain in [defendant's] presence and that he did furnish information to Sgt. Allender. There is no evidence that Oglesby either initiated conversations or interrogated [defendant] on behalf of any police agency, but [simply] passed on information given him by [defendant]."* (Italics added.)

Finally, the referee found no evidence of interrogation in violation of *Miranda* v. *Arizona, supra,* 384 U.S. 436, but did find that counsel's failure to undertake a sufficient legal and factual inquiry into grounds for objecting to Oglesby's testimony constituted unreasonable performance. He expressed no opinion whether counsel's conduct affected the outcome of the case.

2. *Sixth Amendment Analysis*

■ We have recently reviewed the applicable authorities in *People* v. *Hovey* (1988) 44 Cal.3d 543, 559-561 [244 Cal.Rptr. 121, 749 P.2d 776]. Here, as in *Hovey,* we conclude recent high court cases—in particular, *Kuhlmann* v. *Wilson* (1986) 477 U.S. 436 [91 L.Ed.2d 364, 106 S.Ct. 2616]—make it clear there was no Sixth Amendment violation.

*Kuhlmann* involved a prisoner who had previously agreed with the police to act as an informant, and who thereafter reported the accused's "spontaneous" and "unsolicited" incriminating statements to the authorities. The United States Supreme Court held that in order to make out a Sixth Amendment claim under *Henry,* supra, 447 U.S. 264, and *Maine* v. *Moulton* (1985) 474 U.S. 159 [88 L.Ed.2d 481, 106 S.Ct. 477], "the defendant must demonstrate that the police and their informant took some action, beyond their merely listening, that was designed deliberately to elicit incriminating remarks." (*Kuhlmann, supra,* 477 U.S. at p. 459 [91 L.Ed.2d at pp. 384-385, 106 St.Ct at p. 2630].)

In light of *Kuhlmann,* we adopt the referee's implied finding that Oglesby was not a government agent during the period between his arrest and his conversations with Lt. Fitzgerald and Sgt. Allender on May 21-25. We recognize that the sheriff's department followed the practice of accepting information provided by inmates, and, when feasible, of rewarding inmates for providing that information. Oglesby (and likely all other inmates) was probably aware of that policy. But under the authorities we have reviewed, a general policy of encouraging inmates to provide useful information does not transform them into government agents; some specific action "designed deliberately to elicit incriminating remarks" is required. (*Ibid.*) Defendant has not shown sufficient state involvement to render Oglesby's actions during this period the actions of a government agent. Thus, we conclude the evidence that Oglesby revealed to Fitzgerald and Allender on May 21-25 (defendant's admission to killing three persons in a motel, the initial conversations about the escape plan, the map, and certain notes involving the escape) was not procured in violation of defendant's Sixth Amendment rights.

The referee did find that Oglesby was a government agent from May 25 until the end of defendant's trial. Although this finding may well have been correct under then-existing case law, it cannot be sustained in light of the intervening decision by the high court in *Kuhlmann, supra.* As shown by the above-quoted finding of the referee (*ante,* p. 1140), defendant has failed to carry his burden of establishing police action "beyond their merely listening, that was designed deliberately to elicit incriminating remarks." Instead, the referee appears to have found Oglesby was a mere governmental "listening post," which, according to *Kuhlmann,* raises no Sixth Amendment concern. We conclude defendant has failed to establish a Sixth Amendment violation.

3. *Fifth Amendment Analysis*

A different analysis applies to defendant's Fifth Amendment claim. Contrary to defendant's view, *Miranda, supra,* 384 U.S. 436, has never been

applied to conversations between an inmate and an undercover agent. This is because *Miranda* warnings serve to dispel the coercive effect of *police custodial* questioning. Both adjectives are crucial: *Miranda* does not apply to noncustodial police interrogation or to nonpolice custodial interrogation. When a defendant talks to a fellow inmate, the coercive atmosphere of custodial police interrogation is absent. As explained by Professor Kamisar: "One can deliberately elicit incriminating statements from a person without having him realize it—that is what happened in *Massiah* [377 U.S. 201]. But how can one envelop someone in a 'police-dominated atmosphere' without having him realize it? How can one produce an 'interrogation environment' well-calculated to 'subjugate the individual to the will of his examiner' when the individual is not even aware that he is in the presence of 'his examiner'? That is why, I submit, whatever may lurk in the heart or mind of the fellow prisoner (or apparent friend or colleague), if it is not 'custodial police interrogation' *in the eye of the beholder,* then it is not such interrogation within the meaning of *Miranda.*" (Kamisar, *Brewer v. Williams, Massiah, and Miranda: What Is "Interrogation"? When Does It Matter?* (1978) 67 Geo. L.J. 1, 65.)[7]

We conclude the conversations between Oglesby and defendant did not take place in a setting in which *Miranda* warnings were required, and thus introduction of those conversations into evidence did not violate defendant's Fifth Amendment rights. (See *People* v. *Hovey, supra,* 44 Cal.3d at pp. 561-562; *State* v. *McDonald* (La. 1980) 387 So.2d 1116, 1120.)[8]

### B. *Diminished Capacity/Effective Assistance of Counsel*

 Defendant claims his trial counsel was ineffective because he failed to pursue or assert a diminished capacity defense. The appellate record does not establish ineffectiveness. First, we doubt counsel acted unreasonably in failing to assert such a defense. Counsel did retain a psychiatrist, and from this record we believe he could have made a reasonable tactical decision that defendant's abili story was his strongest defense, and that it would be better not to present conflicting defenses. Second, even *assuming* counsel acted unreasonably, it cannot be said from this record that counsel's failure to pursue that defense "prejudiced" defendant. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].) There is no showing of what, if anything, could have been presented.

---

[7]The matter is one of scholarly controversy. Supporting the view of Kamisar quoted in text are 1 La Fave, Criminal Procedure (1984) at page 513, and 2 Ringel, Searches and Seizures, Arrests and Confessions (1985) section 27.4; for a contrary view see Dix, *Undercover Investigations and Police Rulemaking* (1975) 53 Tex. L.Rev. 203, 230-232.

[8]Having reached this conclusion, we necessarily reject defendant's assertion that trial counsel was ineffective by failing to object to the evidence on either Sixth or Fifth Amendment grounds.

■ Nor can we agree that the court erred in declining to instruct on diminished capacity. As noted above, there is some evidence in the record that defendant shared two Sherms with his companions before the 7-Eleven murder. There was, however, no evidence that defendant was thereby impaired; no psychiatric testimony was offered, and defendant did not testify, nor did any of defendant's companions notice that he was affected in any way by the Sherms. Coward testified defendant walked and spoke normally after smoking the first Sherm and did not act unusually during the night. Moreover, there was no evidence that defendant smoked PCP or for any other reason suffered "diminished capacity" at the time of the Brookhaven murders. Indeed, at oral argument, defense counsel admitted the diminished capacity defense was "not fully developed." Based on these facts, the trial court found there was "not sufficient evidence to support diminished capacity instructions," and refused to so instruct.

We agree that the evidence of defendant's alleged diminished capacity was "too insubstantial to require submission of the defense to the jury." (*People* v. *Frierson* (1979) 25 Cal.3d 142, 159 [158 Cal.Rptr. 281, 599 P.2d 587]; see also, *id.*, at pp. 155-157; *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Carr* (1972) 8 Cal.3d 287, 294-295 [104 Cal.Rptr. 705, 502 P.2d 513] and cases therein cited.)

### C. *Escape Testimony*

■ Defendant asserts the court erred in admitting evidence of the alleged pretrial escape plan. As noted above, the evidence consisted of a map drawn by defendant and testimony by Oglesby. As we shall explain, this evidence was properly admitted in the guilt phase.

In *People* v. *Perry* (1972) 7 Cal.3d 756 [103 Cal.Rptr. 161, 499 P.2d 129], we approved the admission of evidence that a defendant had engaged in conversations with other inmates regarding escape plans. The defendant had shown one inmate places in the jail that were vulnerable to escape, and allegedly said he had arranged to obtain hacksaw blades from someone. Later two women were arrested for attempting to smuggle hacksaw blades into the jail. We stated: "Evidence that a defendant was planning an escape, like evidence of flight,[9] tends to demonstrate a consciousness of guilt [cita-

---

[9] In general, evidence that a defendant fled the scene of a crime is admissible to demonstrate *consciousness of guilt.* "[The probative value of flight] as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." (*United States* v. *Myers* (5th Cir. 1977) 550 F.2d 1036, 1049 [42 A.L.R.Fed. 855]; see also *People* v.

tion], regardless of whether the escape was actually attempted [citation]. As such, evidence of a planned escape may be sufficient to corroborate the testimony of an accomplice." (*Perry, supra,* 7 Cal.3d at p. 778.)

Defendant argues, however, that the "escape plan" never reached fruition and that no affirmative steps had been taken in furtherance thereof.[10] Even assuming, as he contends, that it was error to admit evidence of his escape plans, the overwhelming evidence of his guilt makes any such error nonprejudicial. As described below, the jury was properly instructed that it could give such evidence whatever weight it deserved in determining guilt. Although it is true that evidence of a planned escape from custody months after arrest may be less probative of guilt than flight immediately after a crime, the jury could properly determine the probative value of this circumstantial evidence.

### D. *Flight Instruction*

■ Defendant contends the court erred in giving, over his objection, a modified version of CALJIC No. 2.52, the "flight" instruction. The court gave the following instruction: "The *attempted* escape of a person after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but it is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine." (Italics added.)

It is clear that the evidence of a plan to escape would not have supported the giving of a standard flight instruction.[11] (See *People* v. *Anjell* (1979) 100 Cal.App.3d 189 [160 Cal.Rptr. 669].) In *Anjell,* the flight instruction was given based on evidence that robbers had fled the scene of the crime, and that the defendant had made statements about going to Mexico. There was also evidence the defendant and his wife had moved out of the area shortly after the robbery. The court rejected the proposition that the defendant's statements that he wished to borrow money in order to go to Mexico was enough to constitute evidence of "flight." The court stated, "[w]hile it is true that flight 'requires neither the physical act of running nor the reaching

---

*James* (1976) 56 Cal.App.3d 876, 890 [128 Cal.Rptr. 733].) By analogy escape from custody may be analyzed in the same manner.

[10] Although defendant told Oglesby that a gun had been obtained, it was not clear this was in fact true. Further, no meeting took place between Oglesby's wife and defendant's girlfriend.

[11] CALJIC No. 2.52 provides in relevant part: "The *flight* of a person *immediately* after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. . . ." (Italics added.)

of a far-away haven' [citation], it requires more than mere idle words or thoughts. There was no evidence that appellant actually *left* the jurisdiction. No case has been found or cited which indicates that statements alone may suffice to justify a flight instruction." (*Anjell, supra,* at p. 201.)

Defendant asserts, as he did below, that the evidence does not support the instruction, and that the court erred in not defining "attempt." The evidence here, however, goes beyond a mere statement of intent to escape. Defendant enlisted Oglesby's help, drew up detailed plans and maps, arranged to contact persons outside the jail, and explained to them the arms and equipment required. Although such planning activity may not legally constitute an attempt, it is sufficient for the limited purpose for which it was used here—to show consciousness of guilt. Even assuming the court's instruction, by referring only to "attempted escape" may have been incomplete, we discern no prejudice because a more complete instruction encompassing the planning of an escape as showing consciousness of guilt would have been less favorable to defendant.

### E. *Failure to Give Sua Sponte Cautionary Instruction*

■ Defendant next contends the court should have instructed the jury sua sponte that the testimony of the informer—i.e., Oglesby—should be viewed with caution, and that failure to so instruct violated due process.

We recently rejected this claim in *People* v. *Hovey, supra,* 44 Cal.3d 543, 565-566. In any event, we note defendant's conviction was not based solely on the uncorroborated testimony of Oglesby. Coward testified as a witness to the 7-Eleven killing; Coleman and the Garretts each testified that defendant confessed to the Brookhaven Motel murders. Oglesby's testimony was further corroborated by a series of notes defendant had given him relating to escape plans. We thus find no reversible error in the court's failure to instruct sua sponte that Oglesby's testimony must be viewed with caution.

### III. SPECIAL CIRCUMSTANCE ISSUES

### A. *Carlos*

■ Defendant notes the jury was not instructed to find he intended to kill in connection with any of the various special circumstances, and asserts this "error" affects both the felony-murder special-circumstance findings and the multiple-murder special-circumstance finding. (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]; *People* v. *Turner* (1984) 37 Cal.3d 302, 329 [208 Cal.Rptr. 196, 690 P.2d 669].)

We recently held in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138-1150 [240 Cal.Rptr. 585, 742 P.2d 1306], that *Carlos* and *Turner* must be overruled in light of intervening decisions of the United States Supreme Court. We find the record establishes beyond doubt that defendant was the actual killer in this case, and hence the finding required by *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368] is satisfied. (*Cabana* v. *Bullock* (1986) 474 U.S. 376, 390-391 [88 L.Ed.2d 704, 719-720, 106 S.Ct. 689, 699-700].)

### B. *Multiple-Murder Special Circumstances*

■ As noted above, defendant was charged with and found guilty of eight special circumstances: one robbery murder (Pen. Code, § 190.2, subd. (a)(17)(i)) and one multiple murder (*id.*, subd. (a)(3)) as to each of the four victims. Pursuant to *People* v. *Allen* (1986) 42 Cal.3d 1222, 1273 [232 Cal.Rptr. 849, 729 P.2d 115], only one, and not four, multiple-murder special circumstances should have been alleged and found true.

## IV. PENALTY PHASE ISSUES

### A. *Excessive Multiple-Murder Special Circumstances*

As we explained above, the People erroneously charged, and the jury found true, *four* multiple-murder special circumstances instead of just *one*. As in *Allen, supra*, 42 Cal.3d 1222, 1273, however, this error was harmless. The underlying evidence was properly before the jury, and we find it difficult to believe that the sheer "number" of aggravating factors that flowed from the same underlying conduct in itself unduly prejudiced the jury. (See *id.*, at pp. 1281-1283.) Indeed, the absence of prejudice in this case is even clearer than in *Allen*; here, unlike in *Allen,* the prosecutor did not emphasize the *number* of the multiple-murder special-circumstance findings. Accordingly, we discern no prejudice.

### B. *Alleged Boyd and Robertson Errors*

■ At the guilt phase, the People properly introduced evidence of defendant's escape plan, and his threat to kill "Blackie." No formal evidence was presented by either side at the penalty phase. The prosecutor then referred to this evidence during his penalty phase closing argument. Defendant asserts the only possible statutory factor to which this evidence might have applied was Penal Code section 190.3, subdivision (b): "*criminal activity* by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (Italics added.) But, as defendant notes, the prosecutor made no attempt to fit the

evidence in that category; moreover, he argues, neither of the events amounted to a "crime." To further complicate matters, as defendant observes, the jury was never instructed it must find such "crimes" proved beyond a reasonable doubt in order to consider them under subdivision (b). (*People* v. *Boyd* (1985) 38 Cal.3d 762, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782]; *People* v. *Robertson* (1982) 33 Cal.3d 21 [188 Cal.Rptr. 77, 655 P.2d 279].)

Our reading of the record discloses no *Boyd* error, and hence no *Robertson* error. The prosecutor did *not* argue the subject evidence amounted to "other crimes" evidence under subdivision (b). Instead, he merely referred to the "death threat" and "escape plan" evidence in the course of his lengthy discussion of aggravating factors under subdivision (a) (circumstances of the present crime). Later, the prosecutor returned briefly to the escape plan evidence—but again, not in terms of subdivision (b), but in order to disprove the argument that the facts disclosed mitigation under subdivision (d) (extreme mental or emotional distress). Assuming it was error to refer to the subject evidence in the course of his discussion of subdivision (a), on the facts of this case we cannot imagine this amounted to reversible prejudice under any standard.

### C. Subdivisions (a)/(b) "Overlap"

The prosecutor fleetingly argued that the circumstances of the present crime (Pen. Code, § 190.3, subd. (a)) could *also* be considered under subdivision (b) ("other violent criminal activity"). In this way, the jury may have understood that the circumstances of the crime amounted to *two* aggravating factors. As we explained in *People* v. *Miranda* (1987) 44 Cal.3d 57, 105-106 [241 Cal.Rptr. 594, 744 P.2d 1127], the jury may not consider the same evidence under both factors (a) and (b). On this record, however, we find it difficult to believe the sheer "number" of asserted aggravating factors flowing from the same underlying conduct unduly prejudiced the jury. (See *People* v. *Kimble* (1988) 44 Cal.3d 480, 504-506 [244 Cal.Rptr. 148, 749 P.2d 803].)

### D. Instructions on Mitigating Evidence and Jury Discretion

### 1. Factor (k)

The jury was given the unadorned factor (k) (Pen. Code, § 190.3, subd. (k)) instruction (former CALJIC No. 8.84.1). As we held in *People* v. *Easley* (1983) 34 Cal.3d 858, 878 [196 Cal.Rptr. 309, 671 P.2d 813], footnote 10, this language is potentially confusing because it might be understood by the jury to preclude consideration of a defendant's general

character and background evidence. The prosecutor here, however, did not confine the jury's consideration of mitigating evidence to the narrow scope of the instruction. Referring to factor (k), he told the jury: "What could extenuate the gravity of this crime, but not be a legal excuse? [¶] I suppose some kind of emotional comment. Everybody has a mother. Some people have brothers and sisters. [¶] Those are things that seem[ ] always to be focused on the defendant after other people are dead. [¶] The defendant's the one that gets talked about. [¶] If you compare those things as to what defendant did, and whether there is anything there that we can look at and say that because he's twenty-five or twenty-six, because he has a mother, because X, Y, therefore we should take that into consideration as mitigation—that's within the purview and the realm of the jury to make that decision." In the same vein, defense counsel told the jury that it was obligated to consider "sympathy" and "mercy" as mitigating factors in arriving at its sentencing decision. We conclude the jury was not misled about the scope of its factor (k) inquiry.

### 2. *Brown*

 The jury was given the unadorned former CALJIC No. 8.84.2 instructions on its weighing and decisionmaking process. As we explained in *Allen,* our concern in *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], was that the unadorned instruction might, in two related ways, lead the jury to misunderstand its weighing and decision-making responsibility. First, we were concerned that the jury might understand its "weighing" responsibility to require merely that it "count" the aggravating and mitigating factors. Second, we were concerned that the instruction might be understood to allow the jury to return a death sentence without having to come face to face with the question of whether, in the personal moral judgment of each juror, death is the *appropriate punishment in that case*. (*Allen, supra*, 42 Cal.3d at pp. 1276-1277.) We conclude the prosecutor here properly informed the jury of its duty and responsibility in both respects.

First, the prosecutor repeatedly told the jury its task was to "weigh" the factors, and he never suggested this was a "counting" process. Defense counsel, in turn, explicitly told the jury that any one mitigating factor could "outweigh" all of the aggravating factors. Given this, we are confident that a reasonable jury would have understood its discretion to assign whatever weight it deemed appropriate to the various aggravating and mitigating factors.

We turn now to the second aspect of our concern in *Brown, supra*, 40 Cal.3d 512, namely, whether the jury reasonably understood its sole

responsibility to decide, based on the weighing process, whether death is the "appropriate" penalty in a given case.

The prosecutor told the jury repeatedly that its task was to decide whether life without possibility of parole or death is *appropriate* for this defendant; he never suggested the jury could arrive at its sentencing decision without coming face to face with the moral question about the appropriateness of death in this particular case, and he never mentioned the instruction's "shall" language. He told the jury its job was one of *"choosing* one of two penalties" and that if the aggravating factors outweighed the mitigating factors, "that points to death." He stated, "[t]he jury will be determining whether the aggravating factors outweigh the mitigating factors; and if they do, the penalty to be imposed." He argued that this is a case in which the defendant has received due process and that now it is time for a sentence, and "the appropriate punishment is death." He recognized it was not "an easy task," but he stressed it was the jury's responsibility to "listen to all this evidence, and then to have within your discretion, in accordance with the instructions, to evaluate this evidence, to weigh it, and to come to a conclusion as to which penalty is appropriate for Stanley Williams." He then took the jury through the list of statutory aggravating and mitigating factors, and conceded, both explicitly and implicitly, that up to four of the factors *could* be considered as mitigating in this case (Pen. Code, § 190.3, subds. (c), (h), (i) & (k)). He concluded "the evidence . . . shows that all the aggravating factors far outweigh the mitigating factors, and that the appropriate punishment for this defendant is to impose the penalty of death."

Defense counsel also stressed the jurors' individual responsibility in determining the appropriate penalty. He told the jury that each juror must feel he could "pull the switch" in order to vote for death. He told the jury the death penalty is barbaric, but that life in prison without the possibility of parole is worse because it amounts to a "living hell." Regarding the determination of punishment, he said: "I leave that function up to you." He then told the jury that one mitigating factor could outweigh all aggravating factors, and that it was up to the jury to decide "what you think he deserves." He concluded by saying that life in prison is "the appropriate penalty."

We conclude the jury was not misled about the scope of its factor (k) inquiry, nor was it misled about the nature of the weighing process or its responsibility and discretion in determining the appropriate penalty.

E. *Failure to Present Mitigating Evidence*

The record discloses that defense counsel, acquiescing to his client's wishes and going against his own considered judgment, failed to put on any

mitigating evidence although it was apparently available to him. Defendant asserts this requires reversal under *People* v. *Deere* (1985) 41 Cal.3d 353 [222 Cal.Rptr. 13, 710 P.2d 925], and *People* v. *Burgener* (1986) 41 Cal.3d 505 [224 Cal.Rptr. 112, 714 P.2d 1251].

At the start of the penalty phase the prosecutor, defense counsel and defendant met with the trial judge outside the jury's presence. Defendant stated for the record his decision not to testify at the penalty trial, after which defense counsel addressed whether defense witnesses would be called in the penalty trial. The reporter's transcript of defense counsel's remarks provides as follows: "It is my belief that other witnesses be called. Mr. Williams' belief is—just one moment. (A discussion was held off the record.) He is shaking his head and indicating to me it is his desire, his wish, that no other witnesses be called in the penalty phase. [¶] And we have reached that point in the dilemma that Justice Mosk talked about in People versus Jackson, whereby counsel, who has the responsibility for the case, meets head on with the defendant, whose very life is being determined by the decision made herein. [¶] I want the court to clearly understand that Mr. Williams' desire not to have any other witnesses called in this case makes it very difficult for counsel to do so. Either way, I'm going to be second guessed. Whether I'm second guessed by the defendant or I'm second guessed by an appellate court, I'm going to be second guessed either way. [¶] I do believe that I do have available to me witnesses who would help this jury make the ultimate determination.[12] By the same token, I do have to regard the wishes of my client in connection with the noncalling of certain witnesses. [¶] So, with that dilemma before us, I cannot resolve that matter at this precise moment."

After a recess provided so that counsel could further discuss the matter with defendant, the discussion resumed with defense counsel's announcement:

"It's the defendant's desire that no one testify on his behalf in this phase; and I acquiesce to the desires of the defendant. [¶] So there will be no testimony called in this phase of the trial.

---

[12] That defense counsel had specific witnesses in mind is made clear by his above statement and his statement immediately thereafter: "[Y]our Honor, I'm advised by certain witnesses for the defense in mitigation that other witnesses could be made available with the passage of some brief period of time. [¶] If witnesses are to be called today, I anticipate that their testimony would not be of long duration. [¶] I would, however, want the court to constantly consider to continue the case until certain other witnesses can be spoken to and called, who have not been able to be reached during the interim period from Friday to today.

"THE COURT: Well, of course, that's premature at this time. I'm sure you're alerting me to the issue that may arise.

"[DEFENSE COUNSEL]: Thank you. I have nothing further."

"THE COURT: I would strongly urge that if there is any mitigating evidence, and if it can be presented, that you would be inclined to do that. [¶] But, of course, I realize the decision is yours. [¶] Are we ready to proceed?

"[DEFENSE COUNSEL]: Yes, Your Honor. . . ."

The court then turned to defendant and urged him to put on what mitigating evidence he had: "Well, let me indicate, Mr. Williams, that I would strongly urge that if you have any testimony in mitigation that that be presented at this time. [¶] I realize the final decision has to be arrived at with you on the advice of counsel; and I suppose as to those matters counsel has the last word as to whether other mitigating evidence should be presented. [¶] So I want you to be aware that I'm recommending that you present any, if you have any. [¶] Have you had enough time, Mr. Williams, to discuss this matter with your lawyer? (No response.) [¶] The record should reflect that the defendant remained mute in response to that inquiry. . . ."

In *Deere, supra*, 41 Cal.3d 353, the defendant asked the court to sentence him to death. Additionally, defense counsel acceded to his client's wish that available mitigating character evidence not be presented. We reversed the penalty for two reasons.

We first reasoned that "[t]o allow a capital defendant to prevent the introduction of mitigating evidence on his behalf withholds from the trier of fact potentially crucial information bearing on the penalty decision . . . . In [such a] case *the state's interest in a reliable penalty determination* is defeated." (41 Cal.3d 353, 364, italics added.)

Second, the majority reasoned that defense counsel, by simply acceding to his client's wishes and without making an independent tactical judgment about presentation of the mitigating evidence, rendered constitutionally ineffective assistance of counsel. The *Deere* court held that as a matter of law, counsel acted unreasonably in failing to present the evidence over his client's objection, and that reversal was required. We acknowledged that "[b]ecause counsel made no offer of proof, we do not know the precise nature of the mitigating evidence he could have presented." (41 Cal.3d at p. 367.) The majority said it was enough, however, that the record disclosed that "someone" could have testified in mitigation (*ibid.*), and reversed without an assessment of prejudice, stating: "When the sentencer in a capital case is deprived of all or a substantial part of the available evidence in mitigation, 'the potential for prejudice is too obvious to require proof.'" (*Id.*, at p. 368.)

*Burgener, supra*, 41 Cal.3d 505, was also a case in which (i) the defendant asked for death, and (ii) defense counsel acceded to his client's wish that no

mitigating evidence be presented. Additionally, the jury was left with a misleading understanding of the scope of its "factor (k)" inquiry and its sentencing role and discretion under *Brown, supra,* 40 Cal.3d 512. Citing *Deere,* we reversed, based primarily on the first ground stated in *Deere*—i.e., that a sentence rendered under such circumstances is "unreliable."

 Defendant asserts we must reverse for *Deere/Burgener* error, because the record shows that although defense counsel had mitigating evidence available to him (he had apparently interviewed some witnesses, and had others in mind), and even though his tactical judgment favored presenting such evidence, he acquiesced to his client's wishes that the evidence not be presented.

As to the "reliability" concern expressed in those cases, we note this case is different in three respects. First, as *Burgener* itself suggests, the extent to which such "error" may result in an "unreliable" sentencing decision depends largely on the instructions and argument about the scope of the jury's inquiry and discretion—i.e., the factor (k) and *Brown* issues. In *Burgener,* the prosecutor misinformed the jury in both respects (41 Cal.3d at pp. 542-543). In contrast, as discussed above, the prosecutor here did an excellent job of explaining to the jury both its factor (k) and its *Brown* responsibility and discretion. Second, whereas in *Burgener* we suggested failure to present available mitigating character evidence may leave the defendant without *any* mitigating circumstances and hence may "amount[ ] to a directed verdict of death," no such consequence was possible here. Instead, the jury was left to consider a number of the *statutory factors* on the "mitigating" side of the balance. For example, the jury was told—*by the prosecutor*—that it *could* consider as mitigating the following statutory factors: Penal Code section 190.3, subdivision (c) ["presence or absence of any prior felony conviction"], subdivision (h) [defendant impaired by mental defect or intoxication at time of offense], subdivision (i) [defendant's age at time of crime], and subdivision (k). Finally, in *Deere, supra,* 41 Cal.3d at page 361, the defendant (who had waived a penalty jury) made a statement to the court in which he asked for the death penalty. Similarly, in *Burgener, supra,* 41 Cal.3d at page 541, defense counsel read to the jury a statement attributed to his client, in which the defendant asked for the death penalty. Here defendant did no such thing—indeed, defense counsel argued eloquently for life in prison. We therefore conclude the sentence rendered here is not "unreliable" as that term was used in *Deere* and *Burgener.*

 Addressing the effectiveness of counsel claim, we cannot conclude defense counsel rendered constitutionally ineffective assistance on the basis of this appellate record. Even *assuming* counsel acted unreasonably in

failing to override defendant's wishes,[13] there is no showing that such "unreasonable conduct" *prejudiced* defendant's case.

It is established that reversal for ineffective assistance of counsel is generally unwarranted unless *the defendant* shows counsel's alleged failings *prejudiced* his defense. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 693-694 [80 L.Ed.2d 674, 697, 104 S.Ct. 2052]; *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]; *People* v. *Fosselman, supra,* 33 Cal.3d 573, 583-584.) Although *Deere* and perhaps *Burgener* might be read as suggesting that failure to put on available mitigating character evidence requires reversal even if the reviewing court does not know what, if anything, the "missing" evidence would have disclosed—or that failure to put on available mitigating evidence requires reversal without an assessment of prejudice—(*Deere, supra,* 41 Cal.3d at pp. 367-368; *Burgener, supra,* 41 Cal.3d at p. 542), we do not so interpret those decisions. First, both opinions rest primarily on the initial issue discussed above, namely, that on the facts of each case, the resulting sentencing determination was *unreliable.* Furthermore, neither opinion discusses the general rule that prejudice must be proved before a judgment may be reversed for the type of alleged "unreasonable" attorney conduct involved here.

The record contains no indication of what, if anything, defendant's "mitigating character" evidence would have disclosed. (Compare, *Strickland, supra,* 466 U.S. at pp. 675, 677, 678, 700 [80 L.Ed.2d at pp. 685-687, 701] [defendant, in a petition for a writ of habeas corpus, submitted 14 affidavits from friends, neighbors and relatives stating that if asked, they would have testified defendant was essentially a good person who was worried about his family's financial problems]; see *People* v. *Jackson* (1980) 28 Cal.3d 264, 293-296 [168 Cal.Rptr. 603, 618 P.2d 149] [rejecting ineffectiveness claim because "defendant has failed to demonstrate (by his petition for habeas corpus or otherwise) what mitigating evidence, if any, . . . was available to counsel"]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 165 [158 Cal.Rptr. 281 [599 P.2d 587] [defendant, in a petition for a writ of habeas corpus, submitted declarations from friends and relatives disclosing facts about his childhood, family difficulties, and absence of violent tendencies].)

---

[13] Of course, neither *Deere, supra,* 41 Cal.3d 353, nor *Burgener, supra,* 41 Cal.3d 505, should be read to require that defense counsel put on mitigating character evidence when, in counsel's judgment, tactical considerations argue against that course. For example, as the People pointed out at the first oral argument in this case, counsel might reasonably conclude that presenting mitigating "good character" evidence would open the door to strong rebuttal evidence and, therefore, defendant would be better off by declining to put on such evidence. (See, e.g., *Burger* v. *Kemp* (1987) 483 U.S. 776 [97 L.Ed.2d 638, 107 S.Ct. 3114].) In such a case, we would certainly not conclude counsel acted unreasonably. It is not clear from the record, however, whether such a tactical consideration motivated counsel's decision here.

We cannot, and will not, predicate reversal of a judgment on mere speculation that some undisclosed testimony may have altered the result. We conclude, therefore, that defendant has not carried his appellate burden of demonstrating a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at p. 698].)

### F. *Exclusion of Evidence About Carrying Out Executions in California*

 Defendant sought to present evidence of how an execution in the California gas chamber is carried out, in order to impress on the jury the heavy responsibility of its task. The court excluded the evidence. This ruling was correct under *People* v. *Harris* (1981) 28 Cal.3d 935, 962 [171 Cal.Rptr. 679 [623 P.2d 240], in which we rejected an identical argument.

### G. *Giving Former CALJIC No. 8.84.1 in Full*

Defendant complains the court should have "edited out" the "obviously inapplicable" factors in the statutory instruction. We have recently rejected the same argument in *People* v. *Ghent* (1987) 43 Cal.3d 739, 776 [239 Cal.Rptr. 82, 739 P.2d 1250] (1977 law), and *People* v. *Miranda, supra,* 44 Cal.3d 57, 104-105 (1978 law).

### H. *Alleged Jury "Misconduct"*

 Defendant asserts he was deprived of various constitutional rights because of the possibility that the jury considered extraneous evidence at the penalty phase. On the day the jury began its penalty phase deliberations, an alternate juror told the bailiff the jury believed defendant had threatened the jury on the previous Friday after the guilt verdict was returned. The court then questioned the alternate juror who had reported the remark:

"THE COURT: Mrs. Bela, I have been informed by the bailiff that you recently [in] the last few minutes reported to him something concerning [something] the defendant might have said to you. [¶] MRS. BELA: He didn't say anything to me. The jury was aware of a comment. [¶] THE COURT: Well, today, was there any conversation? [¶] MRS. BELA: No. No. [¶] THE COURT: Any comments directed to you? [¶] MRS. BELA: No. [¶] THE COURT: Is this the lady you talked to? [¶] THE BAILIFF: Yes, Your Honor. Apparently she's referring to last Friday. [¶] THE COURT: What comment is this that you're referring to? [¶] MRS. BELA: It was after the verdict was read. [¶] THE COURT: What did you hear, if anything? [¶] MRS. BELA: Well, the jurors sitting in the center said that the defendant looked at

us and said that he was going to get all of us. [¶] THE COURT: Did you hear him say that? [¶] MRS. BELA: No, I didn't. [¶] THE COURT: All right. You may step down. Thank you."

The court then separately questioned three alternate jurors, asking each of them whether defendant said anything to them. Each alternate responded with "Not today" or "Nothing today." The court then observed there had been a misunderstanding and that the comments were related to something that had happened when the verdict was read and that defense counsel had explained the remark to the court.[14] Counsel expressed concern that this comment could affect the jury's deliberations although the comment was not evidence, and suggested the court might inquire of the regular panel whether it gave any consideration to the fact of a threat against the panel. He also "suggested" declaring a mistrial as to the penalty phase.

The court reluctantly conducted a voir dire of the penalty phase foreman. It was apparent from the foreman's comments that the jury had already reached a verdict, and that the jury had not discussed the alleged threat until after it had reached a verdict:

"THE COURT: It has come to the court's attention that there is a possibility that some remark might have been made by the defendant that was heard by the jury on the date that the jury returned its verdict at the guilt phase. Do you have any information concerning that? [¶] MR. BRAMHALL: I do. [¶] THE COURT: What is that? [¶] MR. BRAMHALL: He did utter a statement as we were concluding. [¶] THE COURT: What was that statement? [¶] MR. BRAMHALL: 'I'm going to get each and every one of you mother fuckers.' [¶] THE COURT: Did you personally hear him make that statement? [¶] MR. BRAMHALL: I did not. I saw him mouthing it; but I did not hear it. [¶] THE COURT: In other words, were you able to make out the words? [¶] MR. BRAMHALL: I was not. One of the other jurors was. [¶] THE COURT: All right. Did that play any part in the deliberations of this case concerning the penalty? [¶] MR. BRAMHALL: It did not. [¶] THE COURT: Was there any discussion of that comment at the time during the penalty phase of this trial? [¶] MR. BRAMHALL: No. Not until after the verdict had been reached. [¶] THE COURT: You've now reached a verdict? [¶] MR. BRAMHALL: We have. [¶] THE COURT: All right."

After the verdict was read, defense counsel requested individual voir dire in order to determine whether the comment had been discussed during the

---

[14] Counsel explained defendant had asked him: "Are those the sons-of-bitches who are going to decide what happens to me?" and that this remark may have been misperceived by the jury.

penalty deliberations. The court noted that defendant should not benefit from his own wrongdoing and denied the request.

Evidence obtained by jurors from sources other than in court is misconduct and constitutes grounds for a new trial if the defendant has been prejudiced thereby. (Pen. Code, § 1181, subd. 2.) It is not clear, however, that such a rule applies to the jurors' perceptions of the defendant, particularly when the defendant engages in disruptive or otherwise improper conduct in court. As a matter of policy, a defendant is not permitted to profit from his own misconduct. (See, e.g., *People* v. *Slocum* (1975) 52 Cal.App.3d 867, 885-886 [125 Cal.Rptr. 442]; *People* v. *Manson* (1976) 61 Cal.App.3d 102, 157 [132 Cal.Rptr. 265].) The *Manson* case is particularly relevant here. In *Manson* the court allowed a witness to testify regarding threatening gestures made by the defendant during trial. Further, the witness was allowed to testify that he observed an "X" on Manson's forehead on one day, and that on the following day, he observed "X"s on the foreheads of some of the defendant's associates. The court assumed it was not improper for the jury to have observed them: "It is not too speculative to presume these decorations were observable by the jury. Testimony concerning these markings could not be prejudicial and its admissibility was well within the discretion of the trial court. . . . The stigmatic effect of this circumstance, if any, was produced entirely by the voluntary act of appellants." (*Manson, supra*, 61 Cal.App.3d at p. 157.)

Misconduct creates a presumption of prejudice that may be rebutted by a showing that no prejudice actually occurred. (*People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050].) Assuming arguendo that consideration of the remark constituted misconduct, any presumption of prejudice was adequately rebutted. "[W]hether a defendant has been injured by jury misconduct in receiving evidence outside of court necessarily depends upon whether the jury's impartiality has been adversely affected, whether the prosecutor's burden of proof has been lightened and whether any asserted defense has been contradicted. If the answer to any of these questions is in the affirmative, the defendant has been prejudiced and the conviction must be reversed. On the other hand, since jury misconduct is not per se reversible, if a review of the entire record demonstrates that the appellant has suffered no prejudice from the misconduct a reversal is not compelled." (*People* v. *Martinez* (1978) 82 Cal.App.3d 1, 22 [147 Cal.Rptr. 208].) When a court perceives that the jury has been exposed to extraneous material, it is the court's duty to ascertain the nature of that evidence and its effect on the jurors' ability to deliberate impartially.

Although it may have been appropriate to voir dire the jury in order to determine whether any of its members perceived that defendant had

threatened them, it is clear that failure to do so here was harmless. The jury foreman informed the court that the alleged threat by defendant had not been discussed during the penalty deliberations. The presumption of prejudice was adequately rebutted by the determination that the comment had not been discussed during the deliberations.

### I. Evidentiary Hearing to Determine Extent of Monitoring of Defendant's Jailhouse Conversations

██ As a result of the information obtained from Oglesby regarding defendant's escape plan, the district attorney arranged to monitor defendant's conversations with visitors. Defendant now asserts that, in view of the nature of the penalty, we should take the extraordinary step of remanding for an evidentiary hearing to ascertain the nature and extent of these "taps" in order to determine if any "impropriety was involved in the prosecution of the action." Essentially, he suggests the jailhouse monitoring may have hampered his presentation of a diminished capacity defense."

We reject defendant's contention. First, as he is obviously aware, the proper procedure for obtaining an evidentiary hearing is by a petition for a writ of habeas corpus. Second, even if we were to construe his appellate brief as a petition for a writ of habeas corpus, we could not order an evidentiary hearing. Defendant alleges no facts which, if true, would warrant relief. There is no contention that conversations between defendant and his attorneys or psychiatrists were monitored. Nor, as noted above, is there any suggestion of what, if anything, the psychiatric examinations would have disclosed.

### J. Constitutional Challenge to the 1978 Law

Defendant contends the 1978 death penalty law violates the Eighth Amendment because it does not provide adequate safeguards to ensure against arbitrary death judgments, and does not provide for appellate proportionality review. Each of his federal constitutional arguments has been considered and rejected in recent opinions. (See, e.g., *People* v. *Rodriquez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].)

Nor could defendant successfully assert his sentence is unconstitutionally disproportionate under article I, section 17 of the California Constitution. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 449-484 [194 Cal.Rptr. 390, 668 P.2d 697]; *In re Lynch* (1972) 8 Cal.3d 410, 423-429 [105 Cal.Rptr. 217, 503 P.2d 921].) In view of the facts set out *ante,* at pages 1134-1137, defendant cannot show his sentence is disproportionate to his individual culpability.

Nor can defendant claim his sentence otherwise violates the *Dillon/Lynch* requirements. (See *Allen, supra*, 42 Cal.3d 1222, 1285-1286.)

## V. CONCLUSION

We affirm the judgment of guilt, the finding of five special circumstances, and the judgment of death. The petition for a writ of habeas corpus is denied.

Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.**—I concur in the judgment insofar as it affirms the judgment as to guilt and the determination of death-eligibility. I also concur in the denial of the petition for a writ of habeas corpus.

I dissent, however, from the judgment insofar as it affirms the judgment as to penalty: in my view, defense counsel's failure to present any evidence in mitigation resulted in a constitutionally unreliable verdict of death.

In *People* v. *Deere* (1985) 41 Cal.3d 353 [222 Cal.Rptr. 13, 710 P.2d 925], this court reversed a judgment of death on the ground that defense counsel's failure to present evidence in mitigation—albeit in accord with his client's wishes—rendered the penalty determination constitutionally unreliable. In arriving at this conclusion, the court reasoned as follows.

First, the court determined that counsel's failure to present evidence in mitigation introduced error into the penalty proceeding.

"To permit a defendant convicted of a potentially capital crime to bar his counsel from introducing mitigating evidence at the penalty phase . . . would . . . prevent this court from discharging its constitutional and statutory duty to review a judgment of death upon the complete record of the case, because a significant portion of the evidence of the appropriateness of the penalty would be missing.

"This deficiency of the record implicates another paramount concern of the state: 'in capital cases . . . the state has a strong interest in reducing the risk of mistaken judgments.' (*People* v. *Chadd* (1981) 28 Cal.3d 739, 751 [170 Cal.Rptr. 798, 621 P.2d 837].) In *Chadd* we upheld the validity of a statute that bars acceptance of a guilty plea to a capital charge without the consent of defense counsel. ([Pen. Code,] § 1018.) We observed that the statute was enacted as part of the Legislature's response to *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726], and its companion cases, which condemned arbitrariness in the operation of death

penalty laws: this history, we said, demonstrated that the Legislature intended the statute 'to serve as a further independent safeguard against erroneous imposition of a death sentence.' (28 Cal.3d at p. 750.) Since 1976 the United States Supreme Court has repeatedly recognized that the qualitative difference between death and all other penalties demands a correspondingly higher degree of reliability in the determination that death is the appropriate punishment. (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978] (plur. opn.).) And since 1978 the high court has insisted that the sentencer must be permitted to consider any aspect of the defendant's character and record as an independently mitigating factor. (*Lockett* v. *Ohio* (1978) 438 U.S. 586, 604-605 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954] (plur. opn. of Burger, C. J.).)

"To allow a capital defendant to prevent the introduction of mitigating evidence on his behalf withholds from the trier of fact potentially crucial information bearing on the penalty decision no less than if the defendant was himself prevented from introducing such evidence by statute or judicial ruling. In either case the state's interest in a reliable penalty determination is defeated." (41 Cal.3d at pp. 363-364.)

Next, the court determined that so long as "the record . . . demonstrates 'the possibility that at least *someone* might have been called to testify on defendant's behalf and to urge that his life be spared' " (41 Cal.3d at p. 367, italics in original), the error introduced into the penalty proceeding by counsel's failure to present evidence in mitigation cannot be deemed harmless. The court explained:

"When the sentencer in a capital case is deprived of all or a substantial part of the available evidence in mitigation, 'the potential for prejudice is too obvious to require proof.' [Citation.] Indeed, 'short of substituting a verdict of its own, there is no way for a reviewing court to determine what effect unpresented mitigating evidence might have had on the sentencer's decision.' [Citation.] We have no doubt that a judgment of death imposed in such circumstances constitutes a miscarriage of justice (Cal.Const., art. VI, § 13): not only did defendant not have a fair penalty trial—in effect he had no penalty trial at all." (41 Cal.3d at p. 368.)

In *People* v. *Burgener* (1986) 41 Cal.3d 505 [224 Cal.Rptr. 112, 714 P.2d 1251], the court affirmed the soundness of the *Deere* analysis set forth above. (*Id*. at pp. 540-542 (plur. opn. of Grodin, J.); see *id*. at pp. 543-544 (conc. opn. of Mosk, J.); *id*. at p. 544 (conc. opn. of Broussard, J.).) Applying that analysis to the facts of *Burgener,* the court reversed the judgment of death therein.

I now turn to the case at bar. On the face of the record it is plain that *Deere* error occurred: at defendant's direction, counsel declined to present any evidence in mitigation. The majority concede as much. As they admit, "The record discloses that defense counsel, acquiescing to his client's wishes and, going against his own considered judgment, failed to put on any mitigating evidence although it was apparently available to him." (Maj. opn., *ante,* p. 1149.)

It is also plain that the error here cannot be deemed harmless. As in *Deere,* "the record . . . demonstrates 'the possibility that at least *someone* might have been called to testify on defendant's behalf and to urge that his life be spared.' " (41 Cal.3d at p. 367, italics in original.) Again the majority concede as much. In the text quoted above, they admit that mitigating evidence was "apparently available." (Maj. opn., *ante,* at p. 1150.) Indeed, at another place they acknowledge that the record revealed "defense counsel had specific witnesses in mind . . . ." (*Id.* at p. 1150, fn. 12.)

Although, as shown above, they effectively concede that reversible *Deere* error occurred here, the majority nevertheless hold to the contrary. To support their conclusion, they claim in substance that the verdict of death in this case is not as "unreliable" as the verdicts in *Deere* and *Burgener.* In so doing, they rely on the following points: (1) unlike the jurors in *Burgener,* the jurors here were not misled as to the nature and substance of the penalty determination or as to the relevance of evidence relating to the defendant's background and character; (2) unlike the jurors in *Burgener,* the jurors here were left to consider certain statutory factors bearing on mitigation; and (3) unlike the jurors in *Burgener* and *Deere,* the jurors here were not presented with a statement by the defendant asking for the death penalty.

To my mind, the majority's attempt to distinguish this case from *Deere* and *Burgener* on its facts is at best empty and at worst sophistical. Put simply, the fact that the verdict of death in each of those cases may have been *more* unreliable than the verdict here is immaterial: the verdict of death in this case remains constitutionally unreliable.

Further, each of the points relied on by the majority reveals a distinction without a difference. To begin with, that the jurors here may not have been misled as to the nature and substance of the penalty determination or the relevance of defendant's background and character cannot make up for the total lack of mitigating evidence for them to weigh in determining the appropriateness of death, and therefore cannot neutralize the prejudicial effect of the *Deere* error. Similarly, it is immaterial that the jurors here may have been allowed to consider certain statutory *factors* bearing on mitigation: there was no mitigating *evidence* for them to weigh under those

factors. Finally, that defendant did not ask for the death penalty is of no consequence: it is the complete absence of evidence in mitigation that is significant here and nothing else.

For the foregoing reasons, I would hold that the verdict of death must be vacated because of *Deere* error. Accordingly, I am compelled to dissent from the affirmance of the judgment as to penalty.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied May 26, 1988. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.