Filed 3/16/15  P. v. Macias CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>EDUARDO ALBERTO MACIAS,<br><br>　　　Defendant and Appellant. | D064624<br><br>(Super. Ct. No. SCS245331)<br><br>ORDER MODIFYING OPINION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on March 11, 2015, be modified as follows:

In the second paragraph on the first page, the name "Raymond M. DiGuiseppe" is changed to "Nancy J. King" so the sentence reads:  Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

There is no change in the judgment.

McCONNELL, P. J.

Copies to:  All parties

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064624 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS245331) |
| EDUARDO ALBERTO MACIAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed as modified and remanded with directions.

Raymond M. DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

This case arose out of crimes committed by a group of inmates—some of whom were members of the Mexican Mafia prison gang—against a fellow inmate in a prison yard. In an amended information (information), Eduardo Alberto Macias (the appellant in the current appeal) and his two codefendants at trial—Lionel Alvidrez Quinteros and Geronimo Polina[1]—were charged with three felony offenses: (1) conspiracy to commit murder (count 1: Pen. Code,[2] §§ 182, subd. (a)(1), 187, subd. (a)); (2) attempted murder (count 2: §§ 187, subd. (a), 664); and (3) assault with a deadly weapon by a prisoner (count 4: § 4501). As pertinent here, the information also alleged that Macias committed each crime for the benefit of, at the direction of, or in association with a criminal street gang, within the meaning of section 186.22, subdivision (b)(1); that he personally used a deadly weapon within the meaning of section 12022, subdivision (b)(l) in committing the offenses charged in counts 2 and 4; and that he had suffered three prior strike convictions within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, 668.

During trial before a single jury—after Macias, Quinteros, and Polina rested and while the prosecution was presenting the testimony of a rebuttal witness—Macias pulled out a concealed razor blade and slashed his attorney on the cheek in the presence of the

---

[1]    Five codefendants were originally charged in this matter along with Macias: Quinteros, Polina, Jose Manuel Garcia, Juan Gabriel Morones, and Francisco Daniel Valencia. At some point Valencia pleaded guilty and Garcia and Morones's trial was severed. The remaining defendants—Macias, Quinteros, and Polina—were jointly tried. Neither Polina nor Quinteros is a party to this appeal.

[2]    All further statutory references will be to the Penal Code.

jury. The court individually questioned in camera the 12 jurors and three alternate jurors, and then excused two jurors and replaced them with alternate jurors.

Quinteros, joined by Polina and Macias, moved for a mistrial based on the slashing incident in the courtroom. The court denied the three codefendants' mistrial motions. In denying Macias's mistrial motion, the court told Macias he had forfeited his right to appointed counsel and he should not benefit from his attack on his attorney.

The jury found Macias guilty of all three charged offenses (conspiracy to commit murder, attempted murder, and assault with a deadly weapon by a prisoner) and found to be true the gang enhancement allegation (§ 186.22, subd. (b)(1)) attached to each of those three counts (counts 1, 2, 4) and the personal-weapon-use allegations.

In May 2013 Macias pleaded guilty to aggravated mayhem in *People v. Macias* (Super. Ct. San Diego County, No. SCD235449) in connection with his attack on his attorney during trial in the instant case.

Later, in a bifurcated proceeding, Macias admitted one of the prior strike allegations. The court then sentenced Macias to an aggregate term of 50 years to life plus 29 years. The sentence consisted of an indeterminate term of 25 years to life for Polina's count 1 conspiracy conviction, doubled to 50 years to life under the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12); plus a consecutive determinate upper term of 18 years for his count 2 attempted murder conviction; plus a consecutive one-year term for the count 2 personal-use-of-a-weapon enhancement; plus a consecutive 10-year term for the count 2 gang enhancement. The court imposed, but stayed under section 654, the

3

sentence it imposed for Macias's count 4 aggravated assault conviction and the related personal-use-of-a-weapon and gang enhancements.

*Macias's contentions*

Macias raises six contentions on appeal. First, he contends the judgment must be reversed because the court violated his federal constitutional rights to due process and an unbiased jury when it denied his motion for a mistrial following his courtroom misconduct in slashing the face of his attorney in front of the jury.

Second, he contends the judgment must be reversed because the court erred and violated his federal constitutional rights in ruling he had forfeited his right to counsel by assaulting his counsel in front of the jury.

Third, Macias contends the judgment must be reversed because he was deprived of his right to be either present or represented by counsel during the questioning of the jury after his courtroom attack on his attorney.

Fourth, he contends the judgment must be reversed because he was deprived of his federal constitutional right to a fair trial when "he was compelled to appear in front of the jury in jail clothing."

Fifth, he contends the judgment must be reversed because cumulative error deprived him of his federal constitutional right to due process.

Last, Macias contends the 29-year sentence the court imposed for his count 2 attempted murder conviction and the related sentence enhancements "must be stricken" under section 654. The Attorney General acknowledges Macias's count 2 sentence should be stayed under section 654 because Macias was punished separately for his count

4

conviction of conspiracy to murder Ortiz and "both crimes had the same objective and intent."

We modify the judgment to stay under section 654 the 29-year sentence imposed for Macias's count 2 attempted murder conviction and the related count 2 sentence enhancements. We affirm the judgment as modified and remand the matter to the superior court with directions to correct the abstract of judgment.

FACTUAL BACKGROUND

A. *The People's Case*

Victoriano "Cyco" Ortiz testified both as the victim of the July 5, 2010 attack in the prison yard at the Richard J. Donovan Correctional Facility (Donovan) that is the subject of this case, and as an expert on the Mexican Mafia. Ortiz, who had been a member of the Brole gang in Brawley, California, became an associate[3] in the Mexican Mafia. He was incarcerated at Donovan after he was convicted in 2010 of committing an assault in El Centro for the benefit of the Mexican Mafia.

Ortiz indicated that the Mexican Mafia exerts its control inside California prisons and jails and over Southern California Hispanic street gangs. Members of Hispanic street gangs in Southern California are called "Southsiders." The Mexican Mafia is in charge of the Southsiders. A "Sureño" is a full-fledged "soldier" who is very loyal to the Mexican Mafia. To become a Sureño one must assault somebody in prison or do something that shows his alliance with, and respect for, the Mexican Mafia.

---

3      Ortiz testified that an associate is somebody who has been "validated" and has "a lot of authority and power . . . for the Mexican Mafia."

5

Ortiz testified that the Mexican Mafia communicates to inmates through letters. These letters give inmates authority to "run" the prisons, collect "taxes," and "do whatever has to be done" inside the prisons. To show their respect to the Mexican Mafia, Southsiders must pay "taxes" to the Mexican Mafia in the amount of one-third of all of the proceeds of their illegal activity.

Ortiz also testified that if a street gang fails to pay their respects to the Mexican Mafia, they can get "greenlighted," which means the members of the gang will be beaten or stabbed when they arrive in prison depending on how "hard" the greenlight is. According to Ortiz, members of the Mexican Mafia commit "[a]ssaults, stabbings, shootings, kidnappings, torture, anything that they have to" in order to "get the point across that the Mexican Mafia is and will be respected." The members commit crimes to collect their money, often by extortion. In the prison, a module contains about 20 cells, and each module is run by a "key holder" who is in charge of collecting the taxes for the Mexican Mafia.

Ortiz testified that when he arrived at Donovan, he believed he had permission to run Donovan based on verbal and written authority that Mexican Mafia member Richard Buchanan gave him. Ortiz established a "mesa" (his team or executive committee) with three other Donovan inmates: Polina ("Blue"), Isaac ("Lazy") Ballesteros, and Manuel ("Stomper") Gonzalez. Before July 2, 2010, Macias—a Sureño whom Ortiz knew as "Funny Boy"—was also loyal to Ortiz. Ortiz testified that Quinteros (one of Macias's codefendants at trial), a Southsider whom Ortiz knew as "Chuco," wanted to become loyal to Ortiz's mesa and told Ortiz he would do whatever Ortiz asked.

6

According to Ortiz, a power struggle arose when another inmate, "Casper from Fallbrook,"[4] failed to recognize Ortiz's authority. In an attempt to "come together in agreement," Ortiz tried sending written "kites"[5] to Casper indicating that Buchanan had given him authority to run the prison. Ortiz directed Ballesteros to write a kite telling Casper that he and Ortiz needed to "settle up," but Casper refused to do so.

On July 2, 2010, through a vent, Ortiz overheard a Mexican Mafia associate named Jose Manuel "Crazy Joe" Garcia, who sided with Casper, tell Ballesteros to stab or slice Ortiz and Gonzalez with razor blades. Ortiz testified that he also read some kites sent to Ballesteros stating that Crazy Joe (Garcia) said Ortiz and Stomper (Gonzalez) were supposed to get "hit on the next available yard, no exceptions." These kites noted that Ortiz, Polina, Ballesteros, and Gonzalez were "in the hat," which meant they had "mess[ed] up" and were "done." The word "whacked," which means killed, was used in one of the kites. Ortiz testified he was angry that Ballesteros, a member of his mesa, was being ordered to stab him.

Investigators at Donovan received information that Garcia was going to conduct some criminal activity for the Mexican Mafia at the prison. Unbeknownst to the inmates, microphones were placed in the plumbing chase between two cells where Garcia was

---

4    Pablo ("Casper") Franco.

5    Ortiz testified that "kites" (or "willas") are "small handwritten notes that [inmates] usually fold and roll up real small the size of a capsule. [U]sually an inmate can sneak it under his tongue, in his tooth, in his gums, or if he has to, in his private areas or his toes, or anywhere, because he gets searched." He stated that kites are "confidential communications between inmates" that "generally talk about either Mexican Mafia or prison politics."

located so that law enforcement officers could glean intelligence.  In one recorded conversation, which was played for the jury, Garcia dictated a kite to his cellmate, Juan Morones, giving a direct order for the stabbing of Ortiz.

Knowing from the kites that he might get stabbed, Ortiz went outside to the prison yard on July 5, 2010, at approximately 12:20 p.m., and walked laps with Polina.  Ortiz testified that as he walked and talked with Polina, he observed other inmates walking towards a corner near a toilet stall.  Polina then swung his hand at Ortiz's face, and Ortiz raised his right hand to block the strike and protect his face.  Ortiz felt something cutting his hand.

Ortiz also testified that Macias approached him and slashed his head with a razor while Quinteros punched him and held him down.[6]  Another inmate named "Cobra" Valencia also assaulted Ortiz.  As correctional officers fired shots of increasing lethality, Ortiz's attackers continued to assault him by punching, kicking, and stabbing him, and banging his head against a wall while he tried to cover up and defend himself.  As a result of the razor slashes, Ortiz suffered cuts to his head, back, and hand.  Macias flushed the razor down the toilet.  A video of the incident was played for the jury.

B.  *The Defense*

Macias testified that Ortiz was angry with him because a girl named Priscilla liked him.  To antagonize Ortiz, Macias took a picture of himself kissing Priscilla and sent it to Ortiz.  Macias testified he was not involved in a conspiracy to murder Ortiz, and he

---

[6]    Gonzalez was attacked at the same time as Ortiz.

8

denied receiving instructions to murder him. He claimed he never received a kite about "putting a hit" on Ortiz.

Macias also testified he and Ortiz argued because Macias was upset that Ortiz had made jokes about the fact that he had been incarcerated for beating up a person in a wheelchair. Following this argument, Macias began carrying a razor in his mouth when he went to the prison yard. On the day of the incident, Macias saw Ortiz walking with Macias's friend, Polina. Macias testified that Ortiz took a "cheap shot" at Polina by punching him from the side. Macias removed the razor from his mouth and began "slicing" Ortiz. Macias also testified he had no intent to kill Ortiz, as the razor was small and flimsy. He stated that he flushed the razor down the toilet. He also testified that Quinteros tried to break up the fight.

Several other inmates testified in Macias's defense. Ortiz's cellmate, Angel Cuadra, testified that Ortiz said he was going to attack Polina. Martin Madrid testified that Ortiz told him Macias had taken his girlfriend, Priscilla, from him. Another of Ortiz's cellmates, Anthony Barrera, testified that Ortiz carried razor blades and was angry with Macias because of a woman. "Stomper" Gonzalez testified he witnessed the fight in the yard between Ortiz and Polina. He stated that Ortiz started the fight by hitting Polina. Gonzalez stated he also became involved in a mutual fight. Gonzalez also testified he did not believe a hit was put on him.

9

## I. *DENIAL OF MACIAS'S MISTRIAL MOTION FOLLOWING HIS COURTROOM ATTACK ON HIS ATTORNEY*

Macias first contends the judgment must be reversed because the court violated his federal constitutional rights to due process and an unbiased jury when it denied his motion for a mistrial following his courtroom misconduct in slashing the face of his attorney in front of the jury. We reject this contention.

A. *Background*

1. *Macias's courtroom assault on his attorney and related proceedings that day*

On December 13, 2012, after Quinteros, Macias, and Polina rested their cases, the prosecution recalled Ignacio Bravo, a correctional officer at Donovan, as its first rebuttal witness. As Officer Bravo was testifying, Macias slashed his attorney, William Burgener, in the face with a small razor blade he had concealed in his mouth. Burgener jumped up and exclaimed, "What the fuck did you do to me?" Macias tried to stand up but could not do so because he was bolted down. A bailiff said, "Call first aid." The bailiffs then jumped on Macias. The court said, "Everybody stay right there."

Immediately thereafter, Macias stated, "It didn't have nothing to do with you guys. Officer Bravo—" The court silenced him, stating, "Mr. Macias, you need to keep quiet." The jurors left the courtroom after the defendants were removed from the courtroom. Burgener was taken to the hospital where he received stitches for his wound.

Outside the presence of the jury, in another courtroom, the trial judge summarized what had occurred:

10

"So we were in a different department, Department 25, when Officer Bravo was about to testify as a rebuttal witness for the prosecution. He was the last witness before we were going to instruct the jurors. And as soon as Mr. Bravo took the stand, Mr. Macias apparently had secreted a small─very small razor blade that had some cloth wrapped around the bottom of it, so it was probably maybe a quarter of an inch point, maybe, or maybe three-eighths of an inch point. And he slashed─I guess it was in his mouth. He took it out of his mouth and he slashed Mr. Burgener with it.

"[Macias] was I bolted to the floor so he couldn't get up. And so then Mr. Burgener jumped up and yelled and had blood on his face, and apparently, according to Agent Epperson,[7] had a pretty deep cut on his jawline on his right side.

"So Mr. Burgener had to go to the hospital because it looks like he might have to have stitches. He definitely needs to have that wound thoroughly cleaned. And he's no longer here today.

"But we have a jury that we swore in and listened to the entire proceedings and we were about to instruct. And so since Mr. Burgener is at the hospital and cannot be here, I wanted to have Mr. Macias represented when we decide what kind of--how we are going to proceed from here.

"And so that's why you are here, Mr. Cline.[8] And so now I don't know if you had an opportunity to talk to [Polina's attorney] or [Quinteros's attorney], but I kind of wanted to get an idea of what they think should happen next in their judgment."

At that point, Quinteros's counsel made a motion for mistrial, stating that defendant Macias's conduct in the courtroom involved "the same thing that all three defendants are charged with in this case." Polina's attorney stated he was leaning toward

---

7      Steve Epperson, a special agent at the Special Service Unit of the California Department of Corrections, had previously testified during the People's case-in-chief. Agent Epperson, who was in the courtroom at the time Macias slashed Burgener with the razor blade, assisted Burgener in the courtroom before he was taken to the hospital.

8      Attorney Stephen Cline made a special appearance on behalf of Macias.

a mistrial motion, but first he needed to speak with his client. When Quinteros's attorney pointed out that Macias had been in the courtroom out of the presence of the jury for 30 minutes before he attacked his attorney, the prosecutor responded that Macias attacked Burgener "[o]nly after the jury was brought in[ and] only when the witness took the stand," which suggested Macias slashed his attorney "for the benefit of the jury."

Indicating that the court needed to speak with Macias's attorney to determine whether he wanted to "conflict out," the prosecutor stated that Macias should not benefit from his conduct. The prosecutor suggested Macias would be entitled to a mistrial if Burgener decided he could not continue as Macias's trial counsel because "no one else is ready to represent him at this time." The prosecutor also suggested that the court question the jurors to determine whether they could be fair and that it draft a special jury instruction indicating Macias's conduct could not be used against Quinteros and Polina.

After further discussion, the prosecutor told the court he was going to "change [his] position," noting that he had consulted with a senior deputy attorney general, and he believed "Polina and [Quinteros] have a built in reversal issue because of the horrific act done by Macias." The court noted that the jury had witnessed a "slash attack" that was potentially traumatizing and upsetting for them. Stating that "we're asking a lot" of the jurors by asking them to "forget what [they] saw" and deliberate, the court commented that "we're probably going to do the mistrial route as to [Polina and Quinteros]."

After a recess, Polina's attorney indicated that he had conferred with Polina and that they "wish[ed] to continue on with the trial and finish it up." Quinteros's counsel, however, requested that the court declare a mistrial. Cline, the attorney specially

12

appearing for Macias, stated he thought a mistrial "would be appropriate under the circumstances," but he would "defer to the court." In response, the prosecutor suggested that the court send the jury home to allow the parties to conduct research regarding the issue.

Noting that it also wished to hear from Macias's counsel, Burgener, the court declared a recess.

The court brought the jurors back into the courtroom and gave the following admonishment:

> "First of all, I want to apologize for you[r] having to witness what some of you witnessed. And I also want to apologize for the inconvenience of having you all interviewed because an alleged crime occurred in your presence, and so you were witnesses to that alleged crime, so you were interviewed as witnesses.
>
> "Now, I've been doing criminal cases, either as a lawyer or as a judge, for 30 years, and this is the first time something like this has ever happened, and so I think all--and there are countervailing constitutional rights at play here for defendants, for the prosecutor, and so most of us have not experienced something like this either, so I think we all just need to--the lawyers need to all call time out and do a little research and try to figure out how we should proceed.
>
> "So what that means for you, is that we'd like you to return tomorrow morning at 10:00, and we're going to have a little conference between 9:30 and 10:00 with the lawyers, and then we're going to try to figure out what our next step is. So it may be that we're going forward and doing closing argument. It may be that we are declaring a mistrial and you'll all be excused. But before we figure out what the answer to some of those questions are, we need to have a little time to research it. Okay.
>
> "So now this is going to be the hardest part of the next 22 hours, is that *you are not to form or express an opinion about this case*, you're not to discuss it among yourselves or with others, so that's really important, because I know that this incident is going to be on the

13

news, and so if you can avoid watching the news, that would be great.  It's also going to be in the paper, so please do not read a newspaper article about it, and please do not discuss it with your loved ones. Just say I can't talk about it until the trial is over.

"And I appreciate your work on this case.  We're actually, before this happened, we were making very good progress, and we were going to be doing closing argument, some today and some on Friday.

"So we're actually way, way ahead of schedule.  And so, I mean, we still have a little more time to dedicate to this case, like we told you.

"So anyway, so tomorrow morning at 10:00 o'clock in Department 25.  Not here.  This is our normal department, but that department is a little bit bigger and it accommodates everybody a little better.

"So you're ordered to appear tomorrow morning at 10:00 o'clock outside Department 25.  And like I said, I know it's going to be really hard to compartmentalize this, but I'm going to ask you do that.  And *if we do go forward with argument and deliberations, that you not let what happened in the courtroom affect what you think the evidence does or does not show about what happened at Donovan*.

"So *what happened at Donovan is what you're charged with deciding, not what happened in our courtroom.*  Okay.  [¶] Alright.  Thank you very much.  And you are excused for the day."  (Italics added.)

Outside the presence of the jury, attorney Cline represented to the court that Burgener's wound did not appear to be life threatening and he was being evaluated by a plastic surgeon.  Cline also stated that Burgener believed he had a conflict with Macias and he could not effectively represent him.  The court then adjourned the hearing to give the parties time to conduct research.

2. *The court's in camera interviews of the jurors and alternate jurors*

The following day, December 14, the prosecution filed an opposition to the defense motion for mistrial.  The prosecution urged the court, before deciding whether a

14

mistrial should be declared, to inquire of the jurors whether they could "put the incident aside and decide this case solely on the facts as presented [at] trial and not be influenced by [Macias's] conduct."  The prosecution argued that Macias's attack on his attorney warranted his removal from the courtroom, and that by his actions he had forfeited his right to appointed counsel if Burgener was unable to continue representing him.

At the follow-up hearing that day, outside the presence of the jury, attorney Burgener told the court he was prepared to go forward with closing arguments on behalf of Macias.  In response to the court's inquiry, the prosecutor informed the court that any prosecution of Macias for his courtroom behavior would be handled by the Attorney General's Office.  The prosecutor argued that the incident in the courtroom did not necessarily create a conflict between Burgener and Macias and that it was "allowable and appropriate" for Burgener to continue representing Macias.

The trial court then indicated it believed Burgener had an actual conflict with Macias, notwithstanding Burgener's willingness to continue with the trial, and despite the prosecutor's argument to the contrary. Cline, who again was specially appearing on behalf of Macias, told the court he also believed that an actual conflict existed between Burgener and Macias and then represented that Macias did not believe he could work with Burgener. Burgener reiterated that he was "happy to go forward" despite the fact he had received several fine stitches along his jawline.

The court then held an in camera *Marsden*[9] hearing with Macias, Burgener, and Cline to determine whether Burgener should continue representing Macias. Following the hearing, the court relieved Burgener as Macias's counsel. The court also found that Macias had *forfeited his right to appointed counsel*, indicating that Macias *should not benefit from his own wrongdoing*. The court appointed Cline as Macias's standby counsel. The court then stated it would conduct an in camera hearing with each individual juror to determine whether he or she could be fair and impartial, and then it would address any mistrial motions by the defendants.

During the in camera hearing, the court, with counsel present, individually and privately questioned each of the 12 jurors and three alternate jurors outside the presence of the defendants and the other jurors. The court generally asked each juror four questions: (1) whether the juror could put aside what the juror saw, and fairly and impartially evaluate the evidence; (2) whether the juror could not let what the juror saw affect how he or she looked at Quinteros and Polina, given that neither of these defendants was involved in the incident; (3) whether the juror could fairly and impartially set aside what he or she saw with regard to defendant Macias and decide the charges based on what Macias allegedly did on the date of the charged incident; and (4) whether the juror was interviewed by the sheriff.

As pertinent here, jurors Nos. 1, 3, 4, and 7 through 15 indicated that they were able to put aside their observations of the Macias incident and fairly and impartially

---

9    *People v. Marsden* (1970) 2 Cal.3d 118.

evaluate the evidence and that the incident would not influence how they viewed the evidence against Quinteros, Polina, and Macias.

Juror No. 2, when asked the first question, stated: "My feeling is yes, but I think if once we adjourn to go through the case, we'll be doing a lot of talking." The court indicated that the conversation should not be about what happened in court between Macias and Burgener, and juror No. 2 replied, "I understand." When the court asked juror No. 2 whether he could abide by an instruction not to consider what had happened in court, he indicated he could do so. Juror No. 2 then indicated he would "certainly try" to not let the incident affect his deliberations with regard to Quinteros and Polina, but indicated that "there's got to be an effect" and noted that he observed "a young man that had a very bad temper." The court asked juror No. 2 whether—as to Macias—he could set aside what happened in court and decide the case on what was said on the witness stand. Juror No. 2 replied, "Yes, we could go through our notes and tally it up and figure what's correct."

Jurors Nos. 5 and 6 indicated they did not believe they could be fair and impartial after observing Macias's conduct. The court excused those jurors and replaced them with alternate jurors.

a. *Quinteros's mistrial motion; Macias's and Polina's joinders, and Polina's motion to sever*

Following the in camera interviews of the jurors, and out of the presence of the jury, Quinteros moved for a mistrial based on the slashing incident in the courtroom. Quinteros's counsel argued that Macias, by cutting his attorney with a razor in the

17

courtroom, painted Quinteros and Polina in a bad light, although they were not involved in that incident. He also indicated the Macias incident undermined Quinteros's trial defense of downplaying Ortiz's injuries. Quinteros's counsel also argued the jurors could not put the courtroom incident aside even if they said they could.

Polina and Macias joined Quinteros's mistrial motion. Polina also moved for severance of his trial.

The court noted that 13 of the 15 jurors interviewed said they could be fair and impartial and could set aside what happened, while the two who said they could not were excused. The court stated it did not see how the Macias incident undercut any argument Quinteros intended to make as to the severity of Ortiz's injuries. The court also noted that both Quinteros and Polina sat still during the Macias incident, they appeared to be unaware that Macias was going to do what he did to Burgener, and the jurors indicated they would not hold Macias's actions against Quinteros and Polina.

Following further discussion the court denied the motions for mistrial, reiterating that the jurors indicated they could be fair and impartial and the court had to "take them at their word" and "trust them." Specifically, as pertinent here, the court told Macias in denying his mistrial motion:

> "Like I said before, . . . *you forfeited your right to counsel by participating in that attack*, and so that's why you're pro per now. And *you can't benefit from your attack*. And . . . *the benefit would be that your case gets put off into the future, and then the witnesses get killed or witnesses could go to prison or get transferred, and so it's hard to reconstruct this case six months later*.

18

"And then secondly, the law is very clear that *when you attacked your attorney in the way you did, in a very violent manner, . . . you forfeit your right to have counsel* sitting next to you.

"And then finally, I will say that we have to take the jurors at their word. [W]e can speculate about what they're thinking, but when they tell us [']we can be fair and impartial,['] *we have to take them at their word*. So that's what I'm doing." (Italics added.)

The court also denied Polina's severance motion.

3. *Special jury instructions*

Prior to deliberations, the jury was instructed that it must decide the case based only on the evidence presented in the courtroom. The court also gave the jury the following special limiting instruction:

"Your task is deciding what occurred on July 5th, 2010, at R.J. Donovan state prison. Once you agree . . . on what the facts are in this case, you are to apply the law set forth in these instructions to those facts.

"Ultimately, you will decide whether this case has been proven beyond a reasonable doubt. If it has not been proven beyond a reasonable doubt, you must find the defendants, or any individual defendant against whom the case has not been proven, not guilty.

"*In reaching your determination, you are not to consider anything that you observed, or heard in the courtroom on December 13, 2012. Those events should not enter into or affect your deliberations in any way*." (Italics added.)

4. *Jury verdicts*

As pertinent here, the jury, after about four and a half hours of deliberations, found Macias guilty of all three charged offenses (conspiracy to commit murder, attempted murder, and assault with a deadly weapon by a prisoner) and found to be true the gang

19

enhancement allegation attached to each of those three counts (counts 1, 2, 4) and the personal-weapon-use allegations attached to counts 2 and 4.

B. *Applicable Legal Principles*

Under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 16 of the California Constitution, "[a]n accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is '"capable and willing to decide the case solely on the evidence before it."'" (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294 (*Hamilton*).)

Although "[a] sitting juror's involuntary exposure to events outside the trial evidence" (*Hamilton, supra,* 20 Cal.4th at pp. 294-295) is not misconduct in the pejorative sense, it may still lead to juror bias. (*Ibid.*) Such exposure gives rise to a rebuttable presumption of prejudice. (*People v. Danks* (2004) 32 Cal.4th 269, 307.)

Whether an individual verdict must be overturned as a result of such juror exposure or irregularity "'"is resolved by reference to the substantial likelihood test, an objective standard."'" (*Hamilton*, *supra*, 20 Cal.4th at p. 296.) In *Hamilton*, the California Supreme Court held that "[a]ny presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant." (*Ibid.*) In so holding, the high court explained that "[t]he standard is a pragmatic one, mindful of the 'day-to-day

20

realities of courtroom life' [citation] and of society's strong competing interest in the stability of criminal verdicts [citations].  It is 'virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.'  [Citation.] Moreover, the jury is a 'fundamentally human' institution; the unavoidable fact that jurors bring diverse backgrounds, philosophies, and personalities into the jury room is both the strength and the weakness of the institution.  [Citation.]  '[T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. . . . [Jurors] are imbued with human frailties as well as virtues.  *If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias*.'"  (*Ibid.*, italics added.)

In *People v. Cissna* (2010) 182 Cal.App.4th 1105 (*Cissna*), this court explained that "[w]hen . . . juror misconduct arises from a juror's receipt of extraneous information, juror bias can be inherent or circumstantial.  [Citations.]  Under the *inherent bias test*, the court considers whether the 'extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror.'  [Citations.]  Even when the extraneous information is not so prejudicial, in and of itself, as to cause inherent bias, under the *circumstantial bias test* the court must examine the totality of the circumstances surrounding the misconduct to determine whether a substantial likelihood of actual bias nonetheless arose.  [Citations.]  The judgment must be set aside if the court finds prejudice under either the inherent or circumstantial bias test."  (*Id.* at pp. 1116-1117, italics added.)

21

1. *Standard of review*

Generally, "[w]e review the denial of a motion for mistrial under the deferential abuse of discretion standard." (*People v. Cox* (2003) 30 Cal.4th 916, 953, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) The *Cox* court explained that "'"[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions."'" (*Cox*, at p. 953.).)

We review the legal correctness of the court's ruling, not the court's reasoning. (*People v. Zapien* (1993) 4 Cal.4th 929, 976.)

C. *Analysis*

Macias asserts his courtroom attack on his attorney in the presence of the jury "did not lead to the relinquishment of his rights to due process and a fair trial, which includes his right to a fair and unbiased jury." In support of his claim that the court erred and violated these federal constitutional rights when it denied his motion for a mistrial─which, as noted, was based on his claim that his attack on his attorney likely prejudiced the jury against him─Macias asserts the court "applied the wrong standard when [it] concluded about the jurors, 'I have to trust them at their word'" when they said they could be fair and impartial after the attack. He also asserts the court "refused to even consider whether there should be a mistrial, because . . . the court felt that would cause [him] to benefit from his misconduct." Macias further asserts that he "is unaware of any authority for the proposition that his in-court misconduct can cause a forfeiture or

22

waiver of [these] most fundamental of constitutional rights." These assertions are unavailing.

In denying Macias's mistrial motion, as discussed in greater detail, *ante*, the court explained to Macias that, "when you attacked your attorney in the way you did, in a very violent manner, . . . *you forfeit*[*ed*] *your right to . . . counsel*," and "*you can't benefit from your attack*." (Italics added.) The court also told Macias, "we have to take the jurors at their word . . . when they tell us [']we can be fair and impartial.[']"

As already noted, we review the legal correctness of the court's ruling, not the court's reasoning. (*People v. Zapien*, *supra*, 4 Cal.4th at p. 976.)

Here, we conclude the court properly denied Macias's mistrial motion and did not violate his constitutional rights to due process and a fair trial, including his right to a fair and unbiased jury. The California Supreme Court repeatedly has held that, as a matter of policy, a defendant who commits an act of violence against his attorney in the presence of a jury is not permitted to profit from his own misconduct and may not complain on appeal about the possible effect on jurors of his own misconduct. (*People v. Huggins* (2006) 38 Cal.4th 175, 201 (*Huggins*); *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1030 (*Lewis and Oliver*).)

In *Huggins*, the defendant struck one of his two defense attorneys in front of the jury, knocking her to the ground and causing the jurors to react in alarm. (*Huggins*, *supra*, 38 Cal.4th at pp. 200-201.) Following his assault on counsel, the defendant unsuccessfully requested that the trial court allow him to voir dire the seated jurors on whether each could remain impartial. (*Ibid*.) On appeal the defendant claimed the trial

23

court violated his federal and state constitutional rights to an impartial jury by denying his motion to voir dire the jurors to determine whether his misconduct had prejudiced them. (*Ibid*.) Quoting its prior policy statement in *People v. Williams* (1988) 44 Cal.3d 1127 (*Williams*) (hereafter sometimes *Williams* policy), the Supreme Court rejected this claim, stating:

> "[W]e . . . noted [in *Williams*] that '*As a matter of policy, a defendant is not permitted to profit from his own misconduct*.' ([*Williams*,] at p. 1156.) We adhere to that view here. Defendant may not complain on appeal about the possible effect on jurors of his own misbehavior after the jury has been sworn." (*Huggins*, *supra*, at p. 201, italics added.)

In *Lewis and Oliver*, which is virtually on point, both defendants claimed the trial court erred and violated their rights under the Fifth and Sixth Amendments to the federal Constitution by denying their motion for mistrial after they assaulted counsel in the presence of the jury and thereby disrupted the prosecution's case. (*Lewis and Oliver*, *supra*, 39 Cal.4th at pp. 1029-1030.) Again quoting its strong policy statement in *Williams*, *supra*, 44 Cal.3d at page 1156, the Supreme Court rejected the defendants' claims, stating:

> "In [*Williams*, *supra*,] 44 Cal.3d 1127, we affirmed the judgment in the face of a claim that disruptive courtroom conduct had prejudiced the jury. [Citation.] '*As a matter of policy, a defendant is not permitted to profit from his own misconduct*.' (*Id*. at p. 1156.) We adhere to that commonsense view here. Defendants may not complain on appeal about the possible effect on jurors of their own calculated misdeeds." (*Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1030, italics added.)

*Lewis and Oliver* and *Huggins* govern our decision here. Like the defendants in those cases, Macias attacked his own counsel in the presence of the jury. Like the

defendant in *Lewis and Oliver*, he thereby disrupted the prosecution's presentation of evidence and then used his courtroom misconduct as grounds for seeking a mistrial. "'As a matter of policy, a defendant is not permitted to profit from his own misconduct.'" (*Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1030; *Huggins*, *supra*, 38 Cal.4th at p. 201; *Williams*, *supra*, 44 Cal.3d at p. 1156.) Under this strong and well-established *Williams* policy prohibiting a defendant in a criminal case from profiting from his or her courtroom misconduct, Macias could not disrupt courtroom proceedings by attacking his counsel and then be permitted to successfully rely on his own courtroom misconduct and the resulting disruption of the proceedings as grounds for a mistrial. (*Lewis and Oliver*, at p. 1030; *Huggins*, at p. 201; *Williams*, at p. 1156.) We observe that, here, the trial court appropriately explained to Macias in denying his mistrial motion that "you can't benefit from your attack" and "the benefit would be that your case gets put off into the future, and then the witnesses get killed or witnesses could go to prison or get transferred, and so it's hard to reconstruct this case six months later." It is self-evident that to grant a defendant a mistrial in a criminal prosecution based on the defendant's courtroom attack on his or her attorney in the presence of a jury would create a powerful incentive for defendants to engage in such violence, particularly in gang cases such as the instant one, in order to profit from such misconduct by derailing the judicial proceedings, obtaining a new trial, and thereby delaying their prosecution. This court will not countenance such an outcome.

In light of our decision to enforce the *Williams* policy disallowing a defendant in a criminal case from profiting from his or her courtroom misconduct, we need not, and do

25

not, apply the inherent bias and circumstantial bias tests that this court applied in *Cissna*, *supra*, 182 Cal.App.4th 1105 (discussed, *ante*). The need for such analysis is obviated by the dispositive *Williams* policy that applies here and governs our determination as to this issue.

For all of the foregoing reasons, we conclude the court properly denied Macias's mistrial motion and did not violate his constitutional rights to due process and a fair trial, including his right to a fair and unbiased jury.

## II. *FORFEITURE OF THE RIGHT TO COUNSEL*

Macias also contends the judgment must be reversed because the court erred and violated his federal constitutional rights to counsel and due process in ruling just prior to closing arguments that he had forfeited his right to counsel by assaulting his counsel in front of the jury. We reject this contention.

A. *Background*

During the in camera *Marsden* hearing held on December 14, 2012, the day after Macias slashed his attorney, the court told Macias:

> "I'm not going to appoint a new attorney to represent you. *I'm going to find that you forfeited your right to an attorney*, and so you're going to represent yourself.
>
> "The way it's going to go is we're going to have a hearing. Mr. Cline is going to be your standby attorney. So like I said, if you act out or act like a fool or something, and I have to take you out of the courtroom, then Mr. Cline would sit there and represent your interest in court, but he wouldn't be arguing—well, he would be arguing on your behalf or he would be listening to what other people say. Okay?

26

"So then . . . the rules are going to be that you don't talk unless I ask you to speak. You don't just get to say whatever you want to say. You can listen to what other people say in their closing argument. And you're not going to shake your head and get all animated. You're just going to sit there quietly.

"And then when it's your turn, you're going to get up and say what you want—I mean, what you want within the purview of this case. If you say things that are objectionable, [the prosecutor] is going to object, and if I sustain it, then you can't say that anymore.

"If you don't behave yourself—you're not going to stand up. You're going to be seated. But if you don't behave yourself, you start cussing or trying to act like a hard guy, then you're going to be removed from the courtroom, and Mr. Cline will step up to the podium and say something, or say nothing, but he'll be there representing your interests.

"Okay. So that's the way it's going to go." (Italics added.)

Later, the court told Macias in denying his mistrial motion:

"Like I said before, . . . *you forfeited your right to counsel by participating in that attack*, and so that's why you're pro per now. . . .

"[T]he law is very clear that *when you attacked your attorney in the way you did, in a very violent manner, . . . you forfeit*[*ed*] *your right to have counsel* sitting next to you." (Italics added.)

B. *Analysis*

"Both the United States Constitution and the California Constitution provide the right of a criminal defendant to have the assistance of counsel in his defense." (*King v. Superior Court* (2003) 107 Cal.App.4th 929, 937 (*King*)*,* citing U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15.) "Because it is essential to a fair trial, the right to counsel has long been considered 'fundamental.'" (*King*, at p. 933, citing *Gideon v.*

27

*Wainwright* (1963) 372 U.S. 335, 343.)  However, "[d]espite the fundamental nature of this right, it is not absolute."  (*King*, at p. 933.)

Although the United States Supreme Court has never directly addressed forfeiture through misconduct of the right to counsel, as the Attorney General points out, it has upheld the forfeiture[10] of a criminal defendant's trial-related constitutional rights, such as the right to be present during trial, under certain circumstances involving serious misconduct.  For example, in *Illinois v. Allen* (1970) 397 U.S. 337 (*Allen*) the defendant "argue[d] with the [trial] judge in a most abusive and disrespectful manner" (*id.* at p. 339), told the judge that "you're . . . going to be a corpse here" (*id.* at p. 340), and "tore the file which his attorney had and threw the papers on the floor." (*Ibid*.)  When the defendant continued his abusive behavior after the judge warned him he would be removed from the courtroom if he engaged in "[o]ne more outbreak," the judge ordered the trial to proceed in the defendant's absence.  (*Id*. at pp. 340-341.)  Upholding the trial court's expulsion of the defendant from the courtroom, the Supreme Court stated:

> "Although mindful that courts must indulge every reasonable presumption against the loss of constitutional rights, [citation], we explicitly hold today that *a defendant can lose his right to be present at trial* if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." (*Allen*, at p. 343, italics added.)

---

10     Unlike waiver, which is the intentional relinquishment of a known right, "'forfeiture results in the loss of a right regardless of the defendant's knowledge thereof and irrespective of whether the defendant intended to relinquish the right.'" (*King*, *supra*, 107 Cal.App.4th at p. 938, quoting *United States v. Goldberg* (3rd Cir. 1995) 67 F.3d 1092, 1100.)

28

Like the fundamental right to be present at trial, the Sixth Amendment right to counsel also may be forfeited by a criminal defendant's serious misconduct that endangers the safety of defense counsel, and the right to counsel may be forfeited in certain circumstances *even without a prior warning*. For example, in *King*, *supra*, 107 Cal.App.4th 929, the trial court conducted a hearing to determine whether the defendant had forfeited his right to counsel. (*Id*. at p. 934.) Based on evidence that the defendant had engaged in a pattern of serious misconduct, violence, and threats of violence against a succession of court-appointed attorneys, the trial court found the defendant had forfeited his right to counsel. (*Id*. at pp. 934, 936.) The defendant sought writ relief in the Court of Appeal, contending that, under *Allen*, *supra*, 397 U.S. 337, he was entitled to both a warning and an opportunity to reclaim the right to counsel before he could be deemed to have forfeited that right through misconduct. (*King*, at p. 941.)

The Court of Appeal in *King, supra,* 107 Cal.App.4th 929—observing that the United States Supreme Court in *Allen* and *Taylor v. United States* (1973) 414 U.S. 17[11] "recognized that constitutional rights may be forfeited even absent a warning" (*King*, at

---

[11]    In *Taylor*, the United States Supreme Court rejected the defendant's contention that his voluntary absence from trial could not be construed as an effective waiver of the right to be present absent a showing that he knew or had been warned he had a right to be present and the trial would continue in his absence. (*Taylor v. United States*, *supra*, 414 U.S. at p. 19.) The Supreme Court stated: "It is wholly incredible to suggest that petitioner, who was at liberty on bail, had attended the opening session of his trial, and had a duty to be present at the trial, [citation], entertained any doubts about his right to be present at every stage of his trial. It seems equally incredible to us, as it did to the Court of Appeals, 'that a defendant who flees from a courtroom in the midst of a trial—where judge, jury, witnesses and lawyers are present and ready to continue—would not know that as a consequence the trial could continue in his absence.'" (*Id*. at p. 20.)

29

pp. 940-941)─stated that *Allen* and *Taylor*, read together, "permit loss of a constitutional right in certain circumstances based on misconduct, *even without a prior warning*." (*King*, at p. 943, italics added.) The *King* court also explained that, "[i]n rare cases where the misconduct is so serious that lesser measures are patently inadequate to protect counsel, an accused may forfeit his right to counsel without employing the patently inadequate lesser measures," such as a warning. (*Id*. at p. 934.) The Court of Appeal reasoned that "[c]ourts cannot tolerate misconduct by a defendant that seeks to delay or disrupt judicial proceedings. Even less tolerable is such conduct which additionally *endangers the safety of defense counsel* or others. When a criminal defendant engages in the *most serious misconduct towards counsel*, it is simply 'incredible' that the defendant would not realize his right to counsel may be lost." (*Id*. at p. 943, italics added.)

Here, the record (discussed, *ante*) shows that Macias waited to slash his attorney until after Macias testified in his own defense and the prosecution was presenting its first rebuttal witness. The record supports a finding that Macias attacked his attorney with the razor blade in the presence of the jury in order to create a clear conflict with his court-appointed counsel, and thereby disrupt and delay the court proceedings. We agree with the *King* court's rationale that "[c]ourts cannot tolerate misconduct by a defendant that seeks to delay or disrupt judicial proceedings" (*King, supra,* 107 Cal.App.4th at p. 943) and that a defendant's serious misconduct that "endangers the safety of defense counsel [is] [e]ven less tolerable." (*Ibid*.) This is one of those "rare cases where the misconduct [was] so serious" (*id*. at p. 934) that the accused─Macias─forfeited his right to counsel without the trial court's use of lesser measures, such as a warning. As previously noted,

30

Macias was already I-bolted to the floor when he slashed his attorney. Granting a continuance to allow new appointed counsel to become familiar with the case would have been akin to granting a mistrial in the sense that, as the trial court explained to Macias, the benefit to Macias would have been that the "case gets put off into the future, and then the witnesses get killed or witnesses could go to prison or get transferred, and so it's hard to reconstruct this case six months later."

For all of the foregoing reasons, we conclude the court properly found that Macias forfeited his right to counsel by slashing his counsel in the presence of the jury.

III. *EXCLUSION OF MACIAS FROM THE IN CAMERA QUESTIONING OF THE JURORS FOLLOWING HIS COURTROOM ATTACK ON HIS ATTORNEY*

Macias next contends the judgment must be reversed because he was deprived of his federal constitutional right to be either present or represented by counsel during the questioning of the jury after his courtroom attack on his attorney. We reject this contention.

A. *Background*

During a morning hearing outside the presence of the jury on December 14, 2012—the day after Macias's courtroom attack on his attorney, Burgener—the court found that a conflict existed between Burgener and Macias and then relieved Burgener as Macias's counsel. As discussed, *ante*, the court then found Macias had forfeited his right to counsel as he should not benefit from his own wrongdoing, but it appointed Stephen Cline as Macias's "standby counsel."

Cline responded by telling the court: "[I]t's my understanding I'm going to be the one sitting in there while you conduct this hearing, knowing absolutely nothing about this case or what's transpired. So I think that if he's pro per, he's pro per. That puts us in a very difficult position, because I don't know how I can act effectively on this issue if I don't have any clue as to what has transpired in the case, quite frankly. [¶] And I'm happy to sit in there, but I don't know anything about this case to effectively do anything while I'm in there."

The court replied by telling Cline:

> "Well, I think the bottom line is that what you know is all you need to know. You know that we conducted a trial, that during the course of the trial yesterday Mr. Macias attacked Mr. Burgener, and many of the jurors witnessed that. A couple of the jurors have even been—apparently have been interviewed by law enforcement. [¶] And so those—that's all in play. And so, you know, it's a very simple question. Can you[, the jurors,] be fair and impartial? Can you put that aside and decide this case on what you heard in court, not what you saw in court? And so I think that you can—you're a very experienced attorney. You're one of the premier defense attorneys in San Diego, and so I think that you're going to get up to speed pretty fast, especially when you hear what questions are asked by Mr. Puglia [Polina's counsel] and Mr. Guthrie [Quinteros's counsel]."

The court also stated that, "for security reasons," Macias was not going to be in the room with the jurors "one-on-one." The court added that, "[t]o have them staring face-to-face with him after what they saw, and I don't think it's appropriate and it's not safe."

The court then conducted the in camera hearing with the 15 jurors and alternate jurors. The prosecutor, a supervising deputy district attorney, Polina's and Quinteros's attorneys, and Macias's standby counsel, Cline, were present; Macias, Polina, and

32

Quinteros were not present. Before individually questioning each juror and alternate juror, and outside their presence, the court noted it would not be appropriate for the attorneys to ask questions. The supervising district attorney asked whether the court found that Macias, who was in propria persona, had forfeited his right to be present at the hearing. The court responded:

> "At this particular hearing, I'm doing that for security reasons, and also I find that it would be very intimidating for a juror to sit here and have them sit in close proximity to [Macias] while they're in basically a vacant courtroom. We've already asked much of them to actually come back after all this, after all they saw, and sit as jurors.

The court then individually questioned each juror and alternate juror outside the presence of the other jurors and alternate jurors.

B. *Applicable Legal Principles* (*Criminal Defendant's Right To Be Present at Trial*)

The California Supreme Court has explained that "'[a] criminal defendant's right to be personally present at trial is guaranteed by the Sixth and Fourteenth Amendments of the federal Constitution, as well as by article I, section 15 of the California Constitution and by sections 977 and 1043 of the California Penal Code. [Citations.] A defendant, however, "does not have a right to be present at every hearing held in the course of a trial." [Citation.] A defendant's presence is required if it "bears a reasonable and substantial relation to his full opportunity to defend against the charges." [Citation.]' [Citations.] 'Sections 977 and 1043 do not require the defendant's presence, or a written waiver, unless that standard has been met. [Citations.]' [Citation.] 'The defendant must

33

show that any violation of this right resulted in prejudice or violated the defendant's right to a fair and impartial trial.'" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1052.)

1. *Standard of review*

"An appellate court applies the independent or de novo standard of review to a trial court's exclusion of a criminal defendant from trial, either in whole or in part, insofar as the trial court's decision entails a measurement of the facts against the law." (*People v. Waidla* (2000) 22 Cal.4th 690, 741.)

C. *Analysis*

Macias complains that "[he] was involuntarily deprived of both his own personal presence and that of counsel at the in camera hearings with jurors." He asserts that "[his] presence at this hearing bore a very substantial relation to his ability to defend against the charges"; and that "[he] was prevented, either by personal observation or through counsel, from observing the jurors' reactions and body language, which is, generally, the very basis for reviewing courts' deference to determinations of a juror's impartiality by a trial judge." Thus, Macias maintains, "[b]ecause of his exclusion, [he] was given no opportunity or ability to challenge the trial court's conclusions." These assertions are unavailing.

For reasons discussed, *ante*, we have already concluded that the court properly found that Macias forfeited his right to counsel by slashing his counsel in the presence of the jury. Nevertheless, as noted, Macias's standby counsel, Cline, was present on Macias's behalf (along with the prosecutor, the supervising deputy district attorney, and

34

Polina's and Quinteros's attorneys) during the court's questioning of the jurors and alternate jurors.

Macias's contention that the judgment must be reversed because he was personally excluded from the in camera proceeding is premised on his claim that he had a federal constitutional right to be personally present. Macias, however, had no such right. In *United States v. Gagnon* (1985) 470 U.S. 522 (*Gagnon*), a case in which four codefendants were charged with conspiracy to distribute cocaine, a juror expressed concern that one of the four defendants had been sketching members of the jury during trial. (*Id*. at p. 523.) After ordering the defendant to stop his sketching, the trial court conducted an in camera hearing to ascertain whether the sketching had prejudiced the juror against the defendant. (*Ibid*.) The defendant's counsel was present during the hearing, but the defendant was not. (*Id*. at pp. 523-524.) Following the hearing, none of the defendants moved to disqualify the juror who had witnessed the sketching. (*Id*. at p. 524.) On appeal, each defendant claimed the trial court's in camera discussion with the juror in his absence violated (among other things) his right to be present at all stages of the trial. (*Id*. at pp. 524-525.)

Rejecting that claim, the United States Supreme Court in *Gagnon* explained that "'[t]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has *no constitutional right to be present* at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication.'"

35

(*Gagnon*, *supra*, 470 U.S. at p. 526, quoting *Rushen v. Spain* (1983) 464 U.S. 114, 125-126, last italics added.)

We conclude that Macias, like the defendants in *Gagnon*, had no federal constitutional right to be personally present during the court's in camera questioning of the jurors and alternate jurors. (*Gagnon*, *supra*, 470 U.S. at p. 526.) Accordingly, we reject his contention that the judgment must be reversed because he was personally excluded from that proceeding.

## IV.  *JAIL CLOTHING*

Macias also contends the judgment must be reversed because he was deprived of his federal constitutional right to a fair trial when "he was compelled to appear in front of the jury in jail clothing."  We reject this contention.

A.  *Background*

On Friday, December 14, 2012, the day after Macias attacked his attorney in the courtroom with a razor blade, Macias appeared in court, outside the presence of the jury, in his jail clothing.  The court asked standby counsel, Cline, whether Macias had a shirt he could wear in front of the jury, and Cline indicated that Macias did not have other clothing.  The following exchange then took place between the court and the bailiff indicating there would be no delay in the proceedings:

> "[The court]:  Well, I'm not going to delay the proceedings because he doesn't have clothes right now.  I mean, he can't set up his own error by committing an offense that he did, and then saying, ['Oh], I don't have clothes now, so therefore I shouldn't be in trial.[']  [¶] So he's going to be in his greens, and they don't say county jail on them, but just the shirt does not say county jail on the front.  Does it say county jail on the back?

36

"[The bailiff:] Yes, your Honor.

"[The court:] Well, as long as he sits down and doesn't move forward, and then no one is going to see that. [¶] Okay. And so maybe he can—maybe we can get some more clothes for him for next week."

At the next court hearing, on Wednesday, December 19—outside the presence of the jury—Macias again appeared in court in his jail attire. He informed the court that he was "on disciplinary isolation" as a result of his assault on his attorney and he had not been able to contact his family to have them bring him clothing. Shortly thereafter, the court indicated it was not going to take a recess to give Macias time to get clothing and then told Macias, "The clothes you were wearing were taken as evidence in the stabbing of Mr. Burgener, and so that's why you don't have those clothes now." The court then indicated it would instruct the jury not to consider the fact that Macias was not wearing his "dress-out clothes."

Macias then made a motion for mistrial "on the same grounds, the clothes," which the court denied, stating:

"I understand you're making a motion for mistrial. I'm going to deny it. I guess the jurors have been told on prior occasion that you guys were all in county jail. It's no secret to them. And so I don't think it's that prejudicial for you on this day not to have clothes. [¶] I mean, I guess to me if they can set aside the fact that you sliced your attorney in front of them, and they said they could, and they can be fair and impartial, I don't think that you[r] wearing green jail clothes is going to influence them one way or another."

When the trial resumed, the court gave the following instruction to the jury:

"[Macias] is in green jail clothes rather than his normal collared shirt and pants, and his clothes were taken during the course of the

37

investigation of what happened on December 13th, and so that's why he's wearing jail clothes. [¶] And again, you're not to consider that fact in your deliberations. And that has nothing to do with what happened on July 5th, 2010, as we talked about many times."

B. *Applicable Legal Principles*

As a matter of federal constitutional due process and equal protection, "the State cannot . . . compel an accused to stand trial before a jury while dressed in identifiable prison clothes . . . ." (*Estelle v. Williams* (1976) 425 U.S. 501, 512; *People v. Taylor* (1982) 31 Cal.3d 488, 494.) The rule entitling a defendant to be tried in ordinary clothing is designed to preserve the presumption of innocence. (*People v. Taylor*, at p. 494.) A defendant's appearance in jail clothing "is a constant reminder to the jury that the defendant is in custody, and tends to undercut the presumption of innocence by creating an unacceptable risk that the jury will impermissibly consider this factor." (*Ibid*.)

Where the trial court compels a defendant to be tried in jail clothes, the reviewing court applies the harmless error analysis of *Chapman v. California* (1967) 386 U.S. 18. (*People v. Taylor*, *supra*, 31 Cal. 3d at pp. 499-500.) Under the *Chapman* harmless error standard, "'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.'" (*People v. Taylor*, at p. 499, quoting *Chapman*, at p. 24.)

C. *Analysis*

We first conclude the court erred and impermissibly infringed upon Macias's federal constitutional rights to due process, a fair trial, and equal protection by refusing to order a short continuance of the trial proceedings to provide Macias time to obtain more

38

civilian clothes after the clothes he was wearing at the time of his courtroom slashing attack on his attorney were seized as evidence. (*Estelle v. Williams*, *supra*, 425 U.S. at p. 512; *People v. Taylor*, *supra*, 31 Cal.3d at p. 494.)

Thus, the issue we must decide is whether the federal constitutional error was harmless beyond a reasonable doubt under the applicable *Chapman* harmless error standard. (*People v. Taylor*, *supra*, 31 Cal.3d at p. 499.)

We conclude the federal constitutional error was harmless beyond a reasonable doubt. We begin our analysis by noting the obvious: Macias's appearance in court in jail clothes was a direct result of his criminal act of slashing his attorney's face in the presence of the jury and the ensuing seizure of his civilian clothes as evidence of that crime and his placement in disciplinary custodial isolation. As we have already concluded, the record supports a finding that Macias attacked his attorney in order to create a clear conflict with his court-appointed counsel, and thereby disrupt and delay the trial proceedings. That attack also provided what Macias considered to be a legitimate basis for claiming on appeal that the court should have granted his motion for mistrial, a claim we have rejected.

Macias asserts that, "[w]hile [he] does not claim the evidence is insufficient, per se, to support the verdicts, he did testify on his own behalf and explained to the jury that he was not involved in a conspiracy and did not intend to commit murder." Acknowledging that "he essentially admitted to participating in the assault on Ortiz" in the prison yard, he asserts "[h]is defense was plausible" and suggests his appearance in court in jail clothing "played [a] part in the jury's rejection of his defense."

39

However, as the court pointed out to Macias, it was no secret to the jury that he was being held in county jail. It was also no secret to the jury that Macias was a prison inmate when, as he acknowledged in his testimony, he participated in the prison yard attack on Ortiz. Macias testified that, during that attack, he removed a razor from his mouth and began "slicing" Ortiz. Furthermore, a video of the prison yard attack on Ortiz was played for the jury, and Ortiz testified that the video accurately depicted the attack about which he had already testified. Thus, the jury was well aware before Macias appeared in court dressed in jail clothes that he was a prison inmate when he attacked Ortiz, and that he was still in custody.

In addition, in *People v. Taylor*, *supra*, 31 Cal.3d 488, which Macias cites, the Supreme Court observed that, although an instruction given by the trial court "inform[ed] the jury not to be influenced by the fact of defendant's arrest or because he was charged with a crime or brought to trial, there [was] *no mention of the defendant's jail status nor his jail clothing*." (*Id*. at p. 501.) The *People v. Taylor* court concluded, "Thus, the instruction did not dispel the prejudice." (*Ibid*.)

Here, however, the trial court *did* give an appropriate instruction to dispel any prejudice that might have arisen as a result of Macias's wearing jail clothing in court following his courtroom attack on his attorney. As already noted, the court instructed the jury:

> "[Macias] is in green jail clothes rather than his normal collared shirt and pants, and his clothes were taken during the course of the investigation of what happened on December 13th, and so that's why he's wearing jail clothes. [¶] And again, *you're not to consider that fact in your deliberations. And that has nothing to do with what*

40

*happened on July 5th, 2010, as we talked about many times*."
(Italics added.)

On the record before us, we are confidently able to conclude that the erroneous infringement on Macias's right to appear in court in civilian clothing was harmless beyond a reasonable doubt.

## V.  *CLAIM OF CUMULATIVE ERROR*

Next, Macias contends the judgment must be reversed because cumulative error deprived him of his federal constitutional right to due process.  We reject this contention.

### A.  *Applicable legal principles*

A series of trial errors, though harmless when considered independently, may in some circumstances rise by accretion to the level of prejudicial, reversible error.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  A defendant is entitled to a fair trial, but not a perfect one.  (*Ibid*.)

### B.  *Analysis*

Macias asserts that "[t]he combined effect of each of the errors in which [he] was deprived of constitutional protection—his right to an unbiased jury, his right to counsel, his right to be present at all stages of the trial, and his right to appear in civilian clothing rather than in jail garb—cannot be found to be harmless."

We conclude Macias has failed to meet his burden of showing prejudicial cumulative error.  He has not shown he was denied a fair trial.

## VI.  *COUNT 2 SENTENCING ERROR* (§ *654*)

Last, Macias contends the 29-year sentence the court imposed for his count 2 attempted murder convictions and the related sentence enhancements "must be stricken" under section 654.  The Attorney General acknowledges Macias's count 2 sentence should be stayed under section 654 because Macias was punished separately for his count 1 conviction of conspiracy to murder Ortiz and "both crimes had the same objective and intent."  We conclude the judgment must be modified to stay under section 654 the sentence imposed for Macias's count 2 conviction.

### A.  *Background*

As pertinent here, the court sentenced Macias to an indeterminate prison term of 50 years to life for his count 1conviction of conspiracy to commit murder, plus a consecutive determinate upper term of 18 years for his count 2 attempted murder conviction, plus a consecutive one-year term for the count 2 personal-use-of-a-weapon enhancement; plus a consecutive 10-year term for the count 2 gang enhancement.

### B.  *Applicable Legal Principles* (§ *654*)

Section 654, subdivision (a) provides in part:

> "An act or omission that is punishable in different ways by different
> provisions of law shall be punished under the provision that provides
> for the longest potential term of imprisonment, but in no case shall
> the act or omission be punished under more than one provision."

Section 654 "precludes multiple punishment for a single act or omission, or an indivisible course of conduct" (*People v. Deloza* (1998) 18 Cal.4th 585, 591) and ensures the defendant's punishment will be commensurate with his or her criminal culpability

42

(*People v. Kramer* (2002) 29 Cal.4th 720, 723).  If a defendant suffers two convictions and punishment for one is barred by section 654, "that section requires the sentence for one conviction to be imposed, and the other *imposed and then stayed*."  (*Deloza*, at pp. 591-592, italics added.)

Whether a course of conduct is indivisible for purposes of section 654 depends on the intent and objective of the defendant, not the temporal proximity of the offenses.  (*People v. Hicks* (1993) 6 Cal.4th 784, 789.)  Generally, if all the criminal acts were incident to one objective, then punishment may be imposed only as to one of the offenses committed.  (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507; *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1781.)

C.  *Analysis*

Macias correctly argues that the consecutive sentence the court imposed for his count 2 attempted murder conviction and the related count 2 enhancements must be stayed under section 654.  Given the prohibition against multiple punishment in section 654, punishment for both conspiracy and an underlying substantive offense is "impermissible when the conspiracy contemplated only the act[s] performed in the substantive offense[s] [citations], or when the substantive offenses are the means by which the conspiracy is carried out."  (*People v. Ramirez* (1987) 189 Cal.App.3d 603, 615; *People v. Cavanaugh* (1983) 147 Cal.App.3d 1178, 1182 ["To punish for a conspiracy to commit illegal acts and for the illegal acts themselves violates the [section 654 prohibition against multiple punishments] if the conspiracy has no objective other than the specific acts charged."].)

43

Here, as the Attorney General acknowledges, Macias's base sentence for his count 2 conviction of attempted murder for his act of attempting to murder Ortiz in the prison yard must be stayed under section 654 because (1) he was sentenced to 50 years to life for his count 1 conviction of conspiracy to commit murder, (2) his intent and objective in committing both crimes was the same—to murder Ortiz—and, thus, (3) the section 654 prohibition against multiple punishment proscribes the imposition of additional punishment for Macias's attempted murder conviction.  (§ 654; *People v. Ramirez*, *supra*, 189 Cal.App.3d at p. 615; *People v. Cavanaugh*, *supra*, 147 Cal.App.3d at p. 1182).

Furthermore, both the consecutive one-year term for the count 2 personal-use-of-a-weapon enhancement and the consecutive 10-year term for the count 2 gang enhancement also must be stayed under section 654 because, "[w]here the base term of a sentence is stayed under section 654, the attendant enhancements must also be stayed."  (*People v. Bracamonte* (2003) 106 Cal.App.4th 704, 709, disapproved on other grounds by *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1130, fn. 8.); 3 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Punishment, § 271, p. 429 ["The stay of a sentence automatically stays a sentence enhancement imposed with it, because the enhancement cannot be imposed independently of the underlying sentence."].)

Accordingly, the judgment must be modified to stay the 29-year sentence the court imposed for Macias's count 2 conviction of attempted murder.  As modified, the judgment is affirmed and the matter is remanded to the superior court with directions to correct the abstract of judgment.

DISPOSITION

The judgment is modified to stay execution of the 29-year sentence the court imposed for Macias's count 2 conviction of attempted murder. The judgment is affirmed as modified. The matter is remanded to the superior court with directions that the clerk prepare an amended abstract of judgment to reflect this modification to the judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.

NARES, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.

45